706 A.2d 270

JAMES DALE, PLAINTIFF–APPELLANT, v. BOY SCOUTS OF AMERICA AND MONMOUTH COUNCIL BOY SCOUTS OF AMERICA, DEFENDANTS–RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued December 8, 1997—Decided March 2, 1998.

Landau, J.A.D., concurred and dissented in separate opinion.

518

520

Before Judges HAVEY, LANDAU and NEWMAN.

*Lewis H. Robertson* and *Evan Wolfson,* of the New York Bar, admitted pro hac vice, argued the cause for appellant (*Lewis H. Robertson,* attorney; *Mr. Robertson, Thomas J. Moloney, Mr. Wolfson, Ayala Deutsch* and *Steven M. Knecht* on the brief).

*Sanford D. Brown, George A. Davidson,* of the New York Bar, admitted pro hac vice, and *Carla A. Kerr,* of the New York Bar, admitted pro hac vice, argued the cause for respondents (*Cerrato, Dawes, Collins, Saker & Brown,* attorneys; *Mr. Brown, Mr. Davidson* and *Ms. Kerr,* on the brief).

*David Rocah,* attorney for amici curiae American Civil Liberties Union and ACLU of New Jersey (*Ruth E. Harlow, Matthew A. Coles* and *James D. Esseks,* of counsel and on the brief with *Mr. Rocah*).

*Singer & Fedun,* attorneys for amici curiae American Public Health Association and Parents, Families and Friends of Lesbians and Gays (*Marvin E. Frankel, Jeffrey S. Trachtman, Debora C. Fliegelman* and *William S. Singer,* of counsel and on the brief).

*David H. Dugan, III,* attorney for amici curiae Claremont Institute for the Study of Statesmanship and Political Philosophy (*Mr. Dugan,* of counsel; *Phillip J. Griego,* on the brief).

*Kathleen A. Mazzouccolo,* attorney for amici curiae Diocesan Council of the Episcopal Diocese of Newark, The Friends Committee of National Legislation, The Jewish Reconstructionist Federation, The Union of American Hebrew Congregations and The

Unitarian Universalist Association (*Ms. Mazzouccolo* and *Michael D. Silverman*, on the brief).

*Warshaw & Barnes*, attorneys for amici curiae Individual Rights Foundation (*Bray Barnes, Brian Baker* and *Paul A. Hoffman*, on the brief).

*James P.A. Cavanaugh*, attorney for amicus curiae National Association of Social Workers and New Jersey Chapter of the National Association of Social Workers (*Mr. Cavanaugh*, on the brief).

*Joshua D. Goodman*, attorney for amicus curiae New Jersey Lesbian and Gay Law Association (*Theodore R. Bohn* and *Mr. Goodman*, of counsel; *Mr. Goodman* on the brief).

The opinion of the court was delivered by

HAVEY, P.J.A.D.

Plaintiff James Dale was expelled from his position as an Assistant Scoutmaster with defendant Monmouth Council, Boy Scouts of America when he publicly declared he was a homosexual. He was expelled by the Boy Scouts of America (BSA) because of its policy excluding avowed homosexuals from membership in its organization. We conclude that: (1) the BSA is a place of public accommodation under New Jersey's Law Against Discrimination (LAD), *N.J.S.A.* 10:5–1 to –42; (2) the BSA's expulsion of plaintiff from his position with the BSA violated the LAD by depriving him of a public accommodation; and (3) the LAD's prohibition of the BSA's policy of excluding gay members does not infringe upon defendants' freedom of expressive association. Accordingly, except to affirm the dismissal of plaintiff's common law claim, we reverse and remand for further proceedings.

The BSA charters local groups to maintain units including Cub Scout Packs (boys under eleven), Boy Scout Troops (boys eleven to eighteen), and Explorer Posts (young men and women fourteen through twenty). The troops are sponsored by religious, civic,

fraternal or educational organizations, and other groups whose goals are compatible with those of the BSA.

As of December 1992, the BSA reported 3,453,315 youth members and 1,172,485 adults registered in 123,045 traditional Scout units. The national organization is headed by a National Council and divided into regional administrative units and subdivided into local councils. Monmouth Council has jurisdiction over the geographical area in which plaintiff served. There are approximately 400 local councils. Monmouth Council was incorporated in 1924. In 1991, Monmouth Council had 9,446 youth members and 2,781 adults registered in 215 units.

The BSA was chartered by an Act of Congress in 1915, with its stated purpose:

> to promote, through organization, and cooperation with other agencies, the ability of boys to do things for themselves and others, to train them in Scoutcraft, and to teach them patriotism, courage, self-reliance, and kindred virtues, using the methods which are now in common use by Boy Scouts.

The BSA's bylaws provide: "In achieving this purpose, emphasis shall be placed upon its educational program and the oaths, promises, and codes of the Scouting program for character development, citizenship training, mental and physical fitness." The BSA Mission Statement provides:

> It is the mission of the Boy Scouts of America to serve others by helping to instill values in young people and, in other ways, to prepare them to make ethical choices over their lifetime in achieving their full potential.

> The values we strive to instill are based on those found in the Scout Oath and Law:

## SCOUT OATH

On my honor I will do my best To do my duty to God and my country and to obey the Scout Law;

To help other people at all times;

To keep myself physically strong, mentally awake, and morally straight.

## SCOUT LAW

A Scout is:

| | |
|---|---|
| Trustworthy | Obedient |
| Loyal | Cheerful |
| Helpful | Thrifty |
| Friendly | Brave |
| Courteous | Clean |
| Kind | Reverent |

According to the 1990 Boy Scout Handbook, understanding and agreeing to live by the Scout Oath and the Scout Law are among the joining requirements. According to the Declaration of Religious Principle in the BSA bylaws, although scouting is nonsectarian, all members must recognize an obligation to God.

The Scout Law, set forth in the 1911 Official Handbook for Boys, has remained fundamental and unchanged. The 1936 Handbook for Scoutmasters described the Scout Law as "the foundation upon which the whole Scout Movement rests." It explained:

> The genius of Scouting is most evident in the Law of the Movement. It was based upon the codes of old, transformed into a positive, living ideal for the modern boy, devised as *a guide to his actions rather than as repressive of his faults*. That is what makes the Scout Law outstanding.

The Scout Law neither commands nor prohibits, but positively states these desired qualities.

Plaintiff became a Cub Scout at the age of eight and remained an extremely active and successful youth member of the BSA, achieving the rank of Eagle Scout. In March 1989, seven months after his eighteenth birthday on August 2, 1988, he applied for adult membership and was approved. He then served as an Assistant Scoutmaster for Troop 73 in Matawan, during periods when he was not away at college.

Plaintiff has been a devoted and exemplary Boy Scout. He earned thirty merit badges, advanced to the highest rank, and held numerous trooper leadership positions, including Junior Assistant Scoutmaster. In addition, he was active in the Order of the Arrow, an affiliated honor camping association. In the Order of the Arrow, he was chosen for the highest possible honor, Vigil, and also held numerous offices. Plaintiff was also selected as a delegate to the 1985 National Boy Scout Jamboree, and was

chosen to speak at Monmouth Council functions on more than one occasion.

On August 5, 1990, plaintiff, twenty years old at the time, received a letter dated July 19, 1990, from James W. Kay, Council Executive of Monmouth Council, informing him that his registration was revoked. Registration is a prerequisite for service as a volunteer adult leader. The letter said in part:

> After careful review, we have decided that your registration with the Boy Scouts of America should be revoked. We are therefore compelled to request that you sever any relations that you may have with the Boy Scouts of America.
>
> You should understand that BSA membership registration is a privilege and is not automatically granted to everyone who applies. We reserve the right to refuse registration whenever there is a concern that an individual may not meet the high standards of membership which the BSA seeks to provide for American youth.

Plaintiff answered by letter dated August 8, 1990, asking the grounds of the decision. In a letter dated August 10, 1990, Kay responded: "The grounds for this membership revocation are the standards for leadership established by the Boy Scouts of America, which specifically forbid membership to homosexuals." Kay explained later in a deposition that he became aware that plaintiff was an affirmed homosexual through a newspaper article. The article, published on July 8, 1990, in the Newark Star Ledger, was entitled, "Seminar addresses needs of homosexual teens." It pictured plaintiff, a Rutgers student; identified him as co-president of the Rutgers University Lesbian/Gay Alliance; and quoted him as saying that he had pretended to be straight while in high school, "only admitting his homosexuality during his second year at Rutgers." According to Kay, plaintiff demonstrated his failure to live by the Scout Oath and Law by publicly avowing that he was a homosexual.

By letter dated November 27, 1990, Charles D. Ball, Assistant Regional Director, Northeast Region, BSA, informed plaintiff that the Northeast Region Review Committee supported the decision of Monmouth Council. After further correspondence, a December 21, 1990, letter from the BSA's legal counsel David K. Park to plaintiff's counsel explained: "As your client is apparently an

avowed homosexual and the Boy Scouts of America does not admit avowed homosexuals to membership in the organization, no useful purpose would apparently be served by having Mr. Dale present at the regional review meeting."

According to plaintiff, he was "devastated" by the instruction to sever relations with scouting, which he interpreted to mean that he was not only removed from his position as Assistant Scoutmaster, but also stripped of all his scouting honors, including his Eagle Scout status. However, according to Kay, plaintiff was not stripped of any awards he had earned as a youth, including his attainment of Eagle Scout rank, and his membership revocation was kept confidential.

According to the BSA Rules and Regulations, to serve in an adult leadership position, an individual must be recommended by the scout executive, approved by the council executive board, and be at least twenty-one (eighteen for assistant leaders). All leaders must be commissioned annually. The BSA bylaws provide: "No person shall be approved as a leader unless, in the judgment of the Corporation, that person possesses the moral, educational, and emotional qualities deemed necessary for leadership and satisfies such other leadership qualifications as it may from time to time require." The 1990 Troop Committee Guidebook lists "[h]igh moral standards" and "[c]ommitment to the ideals of Scouting" as the top two characteristics sought in a Scoutmaster. It also suggests that the same standards used to choose a Scoutmaster should be used to qualify Assistant Scoutmasters (eighteen and up).

The 1972 Scoutmaster's Handbook emphasized the leaders' duty as role models, and advised:

> You are providing a good example of what a man should be like. What you do and what you are may be worth a thousand lectures and sermons.
>
> . . . .
>
> What you are speaks louder than what you say. This ranges from simple things like wearing a uniform to the matter of your behavior as an individual. Boys need a model to copy and you might be the only good example they know.

According to Parvin L. Bishop, National Director of Program of the BSA, the requirements that a scout be "morally straight" and "clean" are inconsistent with homosexuality, and therefore known or avowed homosexuals or those who advocate to scouting youth that homosexual conduct is morally straight or clean, will not be registered as adult leaders. The BSA literature does not detail prohibited sexual conduct, but the 1990 Boy Scout Handbook includes a section on "Sexual Responsibility," which summarizes responsibilities to women, to children, to the scout's beliefs, and to himself. It says in part:

> For the followers of most religions, sex should take place only between married couples....
>
> An understanding of wholesome sexual behavior can bring you lifelong happiness....
>
> You owe it to yourself to enrich your life by learning what is right.

In a policy statement dated March 17, 1978, addressed to Executive Committee Members, the National Council asserted that an individual who openly declares himself to be a homosexual would not be selected to be a volunteer scout leader, be registered as a unit member, or be employed as a professional or nonprofessional. This was the earliest express statement concerning homosexual members that defendants produced. Later Position Statements affirmed that stance.

In a Position Statement dated January 1993, several years after the revocation of plaintiff's membership, the BSA stated in part:

> The Boy Scouts of America does not ask prospective members about their sexual preference, nor do we check on the sexual orientation of boys who are already Scouts.
>
> The reality is that Scouting serves children who have no knowledge of, or interest in, sexual preference. We allow youth to live as children and enjoy Scouting and its diversity without immersing them in the politics of the day.
>
> Membership in Scouting is open to all youth who meet basic requirements for membership and who agree to live by the applicable oath and law.

It summarized the BSA position:

> The Boy Scouts of America has always reflected the expectations that Scouting families have had for the organization.
>
> We do not believe that homosexuals provide a role model consistent with these expectations.

Accordingly, we do not allow for the registration of avowed homosexuals as members or as leaders of the BSA.

Plaintiff filed a six-count complaint in the Superior Court, Chancery Division, alleging that defendants' revocation of his membership and his expulsion as an Assistant Scoutmaster violated the LAD, as well as certain common law rights. In the complaint he seeks both reinstatement and damages. Plaintiff filed a notice of motion for partial summary judgment seeking a declaration that he had been deprived of an accommodation in violation of the LAD. He also demanded an immediate reinstatement to his position as Assistant Scoutmaster. Defendants filed a cross-motion for summary judgment on all counts.

In granting summary judgment to defendants, the trial judge determined that the parties had stipulated that plaintiff was "a sexually active homosexual." The judge found that the BSA had consistently excluded from youth and adult membership any self-declared homosexual and that the BSA considered homosexual conduct neither "morally straight" under the Scout Oath nor "clean" under the Scout Law. The judge relied on the entrenched biblical and historical view of homosexuality as not only morally wrong, but criminal, as a basis for the presumption that, from its inception, the BSA implicitly subscribed to that historical view as well.

The judge concluded that plaintiff had no cause of action under the LAD because the BSA was not a "place of public accommodation" as defined by the Act. The judge also agreed with defendants that they qualified for the LAD exclusion in *N.J.S.A.* 10:5–5(*l*) for any "institution ... which is in its nature distinctly private[.]" Finally, the judge concluded that defendants' "First Amendment freedom of expressive association rights prevent[ed] government from forcing them to accept [plaintiff] as an adult leader-member" in view of defendants' historical belief that homosexual conduct was morally wrong, and "[t]he presence of a publicly avowed active homosexual as an adult leader of boy scouts is absolutely antithetical to the purpose of Scouting."

The parties agree that the there are no genuine issues of material fact. Accordingly, the issues raised by this appeal may be resolved as a matter of law.

I

■ Plaintiff contends that the BSA is a place of public accommodation under the LAD, prohibited from discriminating on the basis of affectional or sexual orientation. Plaintiff argues that his expulsion from the Boy Scouts and his position as an Assistant Scoutmaster violated the LAD by depriving him of the privileges and advantages of scouting based solely on his sexual orientation.

The LAD provides:

All persons shall have the opportunity to obtain employment, and to obtain all the accommodations, advantages, facilities, and privileges of any place of public accommodation, publicly assisted housing accommodation, and other real property without discrimination because of race, creed, color, national origin, ancestry, age, marital status, *affectional or sexual orientation,* familial status, or sex, subject only to conditions and limitations applicable alike to all persons. This opportunity is recognized as and declared to be a civil right.

[*N.J.S.A.* 10:5-4 (emphasis added).]

The categories "affectional or sexual orientation" were added in 1991. *L.*1991, *c.* 519, § 2. " 'Affectional or sexual orientation' means male or female heterosexuality, homosexuality or bisexuality by inclination, practice, identity or expression, having a history thereof or being perceived, presumed or identified by others as having such an orientation." *N.J.S.A.* 10:5-5hh.[1]

The LAD renders unlawful certain employment practices or discriminations. *N.J.S.A.* 10:5-12. Plaintiff asserts in his complaint (first cause of action) that defendants have violated *N.J.S.A.* 10:5-12f, which provides in pertinent part that it is unlawful:

For any owner, . . . agent, or employee of any place of public accommodation directly or indirectly to refuse, withhold from or deny to any person any of the

---

[1] Although plaintiff's membership was revoked in 1990, before the category for sexual orientation was added to the LAD, he later sought reinstatement in reliance on the LAD amendment. Defendants do not contend the "affectional or sexual orientation" provision of the LAD is inapplicable.

accommodations, advantages, facilities or privileges thereof, or to discriminate against any person in the furnishing thereof, . . . on account of the . . . affectional or sexual orientation . . . of such person. . . .

In its definitions, the LAD lists, expressly without limitation, numerous places of public accommodation, which "shall include" such places as hotels, camps, shops, restaurants, theaters, swimming pools, hospitals, libraries, colleges and universities. *N.J.S.A.* 10:5–5(*l*). It further provides:

Nothing herein contained shall be construed to include or to apply to any institution, bona fide club, or place of accommodation, which is in its nature distinctly private; nor shall anything herein contained apply to any education facility operated or maintained by a bona fide religious or sectarian institution. . . .

[*Ibid.*]

The trial judge held that:

BSA is not a "place of accommodation" under *N.J.S.A.* 10:5–12(f) and as defined in *N.J.S.A.* 10:5–5(*l*). The lengthy list set forth in the definition is a list of *places*—not one of organizations. A physical place to which one may point is clearly intended.

He added:

A Boy Scout troop bears no similarity to the enumerated places of public accommodation. It consists of a small group of boys and their adult leaders who meet together in various places, viz. their regular meeting hall, in tents during summer camp or at other scout gatherings on scout-owned properties. None of those activities or places are open to the public. The benefits to the boys spring not from the "facility" but from their interaction, training and experiences as a group. Those goals and objectives are totally different from "places" to which the public is invited.

The question whether the BSA is a "place of public accommodation" or "business" has been the subject of lively debate in recent years in other jurisdictions. *See generally* John E. Theuman, Annotation, *Exclusion or Expulsion From Association or Club As Violation of State Civil Rights Act*, 38 *A.L.R.4th* 628 (1985) (collecting cases). The extreme divergence of views on the social issues implicated is emphasized by the prevalence of vigorous dissenting opinions in most cases.

In *Welsh v. Boy Scouts of Am.*, 993 *F.*2d 1267 (7th Cir.), *cert. denied,* 510 *U.S.* 1012, 114 *S.Ct.* 602, 126 *L.Ed.*2d 567 (1993), the BSA denied membership to a boy who refused to affirm a belief in God, as required by the Boy Scout Oath. *Id.* at 1268. The Seventh

Circuit held that the BSA was not a place of public accommodation under Title II of the Civil Rights Act of 1964, 42 *U.S.C.A.* § 2000a, because the statute by its own terms included only an entity that serves the public and may be classified as an "establishment," "place," or "facility," and did not include a membership organization unconnected to a structural facility. *Id.* at 1269. Likewise, the Kansas Supreme Court in *Seabourn v. Coronado Area Council, BSA,* 257 *Kan.* 178, 891 *P.*2d 385 (1995), gave a narrow interpretation of "public accommodation" under the Kansas Act Against Discrimination. The court held that the BSA was entitled to reject plaintiff's application for an adult leadership position on the basis that he was a professed atheist. *Id.* 891 *P.*2d at 391. The *Seabourn* court rejected an interpretation of public accommodations that divorced them from business establishments, and contrasted the personal, private and on-going relationships fostered by scouting with the impersonal, economic and occasional interactions typical in business. *Id.* at 406.[2]

In contrast to the *Welsh* view, Connecticut has interpreted its state public accommodations statute as regulating "the discriminatory conduct and not the discriminatory situs of an enterprise which offers its services to the general public." *Quinnipiac Council, BSA v. Commission on Human Rights and Opportunities,* 204 *Conn.* 287, 528 *A.*2d 352, 357 (1987). However, the

---

[2] Several California courts have considered the issue of whether the Boy Scouts constituted a "business establishment" subject to the Unruh Civil Rights Act. In *Yeaw v. Boy Scouts of America,* 64 *Cal.Rptr.*2d 85, 91–92 (Ct.App.), *review granted and opinion superseded,* 67 *Cal.Rptr.*2d 168, 942 *P.*2d 415 (1997), the court held that the BSA could exclude females because it was not a "business establishment" under the Unruh Act. In *Curran v. Mount Diablo Council of BSA (Curran II),* 29 *Cal.Rptr.*2d 580 (Ct.App.), *review granted and opinion superseded,* 31 *Cal.Rptr.*2d 126, 874 *P.*2d 901 (1994), the court determined that forcing the BSA to accept a homosexual as a troop leader would violate the First Amendment. In *Randall v. Orange County Council, BSA,* 28 *Cal.Rptr.*2d 53 (Ct.App.), *review granted and opinion superseded* 31 *Cal.Rptr.*2d 125, 874 *P.*2d 900 (1994), the court upheld application of the Unruh Act to prevent exclusion from a cub scout pack of twin boys who denied a belief in God. The Supreme Court has "depublished" all three decisions while the cases are pending before it, thereby nullifying their precedential value. *See Cal. Rules of Court* 976, 977 and 979.

Supreme Court of Connecticut declined to rest its holding on this issue. Rather, it held that the BSA did not violate Connecticut's public accommodations statute by refusing to permit a woman to serve as a scoutmaster because there was no denial of "access to its goods and services" and therefore the woman was not deprived of an "accommodation," as that word was used in the statute. *Id.* 528 *A.*2d at 358.

▆▆▆ We reject the narrow interpretation given by *Welsh* to "place of public accommodation." In defining the term we must be mindful that the LAD is remedial "and should be read with an approach sympathetic to its objectives." *National Org. for Women v. Little League Baseball, Inc.,* 127 *N.J.Super.* 522, 530, 318 *A.*2d 33 (App.Div.), *aff'd,* 67 *N.J.* 320, 338 *A.*2d 198 (1974). "[T]he overarching goal of the [LAD] is nothing less than the eradication 'of the cancer of discrimination.'" *Fuchilla v. Layman,* 109 *N.J.* 319, 334, 537 *A.*2d 652 (1988) (quoting *Jackson v. Concord Co.,* 54 *N.J.* 113, 124, 253 *A.*2d 793 (1969)). Its provisions must be construed liberally to effectuate that purpose. *N.J.S.A.* 10:5–3 ("[t]he Legislature intends ... that this act shall be liberally construed in combination with other protections available under the laws of this State"). The LAD should be (and has consistently been) construed broadly and "'with that high degree of liberality which comports with the preeminent social significance of its purposes and objects.'" *Andersen v. Exxon Co.,* 89 *N.J.* 483, 495, 446 *A.*2d 486 (1982) (quoting *Passaic Daily News v. Blair,* 63 *N.J.* 474, 484, 308 *A.*2d 649 (1973)).

Applying *Welsh*'s view that Title II applies only to a "place" would frustrate our goal of eradicating "the cancer of discrimination" in New Jersey. To have the LAD's reach turn on the definition of "place" is irrational because "places do not discriminate; people who own and operate places do." *Welsh, supra,* 993 *F.*2d at 1282 (Cummings, C.J., dissenting). No one can seriously argue that those who operate from a fixed "place" are more apt to discriminate than those who meet at varying locales. *Ibid.* Moreover, such a reading indiscriminately targets those who have the

financial wherewithal to own or operate a "place," and excludes those who do not.

Indeed, New Jersey has rejected the narrow view advanced by *Welsh.* In *Little League, supra,* 127 *N.J.Super.* at 531, 318 *A.*2d 33, we held that Little League Baseball, Inc., is a "place of public accommodation" subject to the LAD. In rejecting Little League's assertion that it was not a "place of public accommodation" because it had no "place" or "situs," Judge Conford for the court observed that the term was one "of convenience, not of limitation." *Ibid.* He added:

> The "place" of public accommodation in the case of Little League is obviously the ball field at which tryouts are arranged, instructions given, practices held and games played. The statutory "accommodations, advantages, facilities and privileges" at the place of public accommodation, *N.J.S.A.* 10:5–12(f), is the entire agglomeration of the arrangements which Little League and its local chartered leagues make and the facilities they provide for the playing of baseball by the children.
>
> [*Ibid.*]

In the *Little League* court's view, the dispositive factor making Little League a public accommodation was that its invitation was "open to children in the community at large, with no restriction (other than sex) whatever." *Ibid.*

Even before *Little League* was decided, our Supreme Court had held that facilities and activities "offered to and ... dependent upon the broad-based participation of members of the general public" are the types of accommodation the Legislature intended to reach through the LAD. *Fraser v. Robin Dee Day Camp,* 44 *N.J.* 480, 488, 210 *A.*2d 208 (1965). In *Fraser,* the owner of a day camp advertised the availability of its facilities to children from two to fourteen years of age. *Id.* at 482–83, 210 *A.*2d 208. Plaintiff's application to enroll his children was rejected because he was "colored." *Id.* at 483, 210 *A.*2d 208. No evidence was adduced before the Division on Civil Rights that the children had not met the health, physical and emotional standards required by the day camp. *Id.* at 484, 210 *A.*2d 208.

The Supreme Court in *Fraser* rejected the day camp's argument that, since it was not one of the enumerated "places" under the act, it was excluded, noting that the statute began by stating that a place of public accommodation "shall include," a term of "enlargement and not of limitation." *Id.* at 485, 210 *A.*2d 208; *see also Zorba Contractors, Inc. v. Housing Auth. of Newark,* 282 *N.J.Super.* 430, 434, 660 *A.*2d 550 (App.Div.1995). The *Fraser* Court observed that the day camp had offered many accommodations in common with swimming pools, recreation and amusement parks, motion picture houses, theaters, gymnasiums and schools, "all of which are specifically enumerated" in the statute as places of public accommodation. 44 *N.J.* at 487, 210 *A.*2d 208. The day camp was therefore "the type of accommodation which the Legislature intended to reach." *Ibid.*

In *Clover Hill Swimming Club v. Goldsboro,* 47 *N.J.* 25, 33, 219 *A.*2d 161 (1966), the Supreme Court revisited the issue and found that a private swimming club was a public accommodation under New Jersey's anti-discrimination statute because of the club's advertising and its extending "an invitation to the public generally" to join. The Court observed that the decision to operate as a private club "should not be permitted to obscure the accommodation's non-private nature." *Id.* at 34, 219 *A.*2d 161. " 'No device, whether innocent or subtly purposeful, can be permitted to frustrate the legislative determination to prevent discrimination.' " *Ibid.* (quoting *Jones v. Haridor Realty Corp.,* 37 *N.J.* 384, 396, 181 *A.*2d 481 (1962)); *see also Sellers v. Philip's Barber Shop,* 46 *N.J.* 340, 348, 217 *A.*2d 121 (1966) (a barber shop is a place of public accommodation because it caters to the public or by advertising or other form of invitation induces patronage generally). Similarly, in *Evans v. Ross,* 57 *N.J.Super.* 223, 231, 154 *A.*2d 441 (App.Div.), *certif. denied,* 31 *N.J.* 292, 157 *A.*2d 362 (1959), Judge Goldmann observed:

[A]n establishment which caters to the public, and by advertising and other forms of invitation induces patronage generally, cannot refuse to deal with members of the public who have accepted the invitation, because of their race, creed, color, national origin or ancestry. The law is designed to insure that all citizens of this

State shall have equal rights as members of the public and not be subjected to the embarrassment and humiliation of being invited to an establishment, only to find its doors barred to them. *Once a proprietor extends his invitation to the public he must treat all members of the public alike.*

[Emphasis added.]

We conclude that the BSA and its local councils are places of public accommodation. The BSA invites "the public at large," *Little League, supra,* 127 *N.J.Super.* at 530, 318 *A.*2d 33, to join its ranks, and is "dependent upon the broad-based participation of members of the general public." *Fraser, supra,* 44 *N.J.* at 488, 210 *A.*2d 208. As of 1993, scouting had nearly 5,000,000 youth and adult members nationwide, and over 100,000 members in New Jersey alone. Plaintiff points out that nearly 90,000,000 boys and men have joined the scouting ranks since 1910. This is no doubt so because the BSA emphasizes open membership in order to maintain its vitality and to reach every aspect of society. Its publication "A Representative Membership" announces that:

Our federal charter sets forth our obligation to serve boys. *Neither the charter nor the bylaws of the Boy Scouts of America permits the exclusion of any boy.* The National Council and Executive Board have always taken the position that *Scouting should be made available for all boys who meet entrance age requirements.*

[Emphasis added.]

Moreover, the BSA engages in advertising and public promotion to encourage new membership. *Fraser, supra,* 44 *N.J.* at 488, 210 *A.*2d 208. Local councils run radio and television spots and conduct "school nights." The BSA has undertaken national television campaigns, hired public relations firms and has produced magazine inserts in national magazines promoting the benefits of scouting. One BSA spokesman has explained "I think of scouting as a product and we've got to get the product into the hands of as many consumers as we can."

Citing *Kiwanis Int'l v. Ridgewood Kiwanis Club,* 806 *F.*2d 468 (3d Cir.1986), *reh'g denied,* 811 *F.*2d 247 (3d Cir.), *cert. dismissed,* 483 *U.S.* 1050, 108 *S.Ct.* 362, 97 *L.Ed.*2d 812 (1987), the BSA argues that it is not a place of public accommodation because its membership practices and policy do not "reflect an open and

unrestricted invitation to the community at large to join" the organization. *Id.* at 476. The BSA points to the fact that it engages in "selectivity" in that membership "is restricted to those willing and able to understand and live by the Scout Oath and Scout Law."

*Kiwanis Int'l* involved a federal action between Kiwanis International and one of its local clubs, Kiwanis Ridgewood. Kiwanis International sought to revoke the local club's license to use the Kiwanis "marks" because the club had admitted a woman in violation of Kiwanis International bylaws. *Id.* at 470–71. The Third Circuit concluded that Kiwanis Ridgewood was not a place of public accommodation under New Jersey's LAD because of the selective criteria for membership in Kiwanis Ridgewood. *Id.* at 471. The evidence was that Kiwanis Ridgewood had only twenty-eight members. *Id.* at 475. Each new member had to be sponsored; sponsorship "acted as a primary screening mechanism in the maintenance of the quality of membership." *Ibid.* Moreover, the local club engaged in a selective, rather than large scale membership solicitation by sending invitations only to prospects already known by current members. *Ibid.* The court concluded:

> This evidence of membership practices and policy does not reflect an open and unrestricted invitation to the community at large to join Kiwanis Ridgewood. Rather, all the evidence points totally in the opposite direction. If the test of "place of public accommodation" is unselectivity, unrestrictedness, and open invitation, as *Little League* informs us that it is, it is evident Kiwanis Ridgewood's practices do not pass the test.
>
> *[Id.* at 476.]

The BSA contends that membership in its organization is "no less selective than membership in a local Kiwanis club."

*Kiwanis Int'l* is clearly distinguishable. There the focus was on the attributes and membership criteria of a small local club. Here, plaintiff was expelled because of the BSA's enforcement of its national policy precluding avowed homosexuals from its membership. Thus, we focus on the membership criteria of the BSA as a national organization. The BSA's national membership criteria are clearly less restrictive than those applied by the local club in *Kiwanis Int'l.* The BSA's criteria, acceptance of the Scout Oath

and adherence to its laws, are conditions not significantly different from the boys' willingness to abide by the standards of the Little League: requiring tryouts; demanding adherence to the rules of the game; and requiring the physical attributes and skills to play it. *See Little League, supra*, 127 *N.J.Super.* at 530–31, 318 *A.2d* 33. Considering the undisputed invitation for membership in its literature to "all boys," we deem the BSA's "selectivity" criteria inconsequential.

The BSA adds that we should focus on the "even more restricted and selective" criteria for adult membership in deciding whether the BSA is a place of public accommodation. It points to the fact that troop committees weigh prospective adult leaders according to various characteristics including: (1) high moral standards; (2) commitment to the ideals of scouting; (3) ability to relate to boys; (4) ability to keep a "cool head" under pressure; and (5) organizing ability.

We reject the suggestion that the BSA organization as a whole is not a place of public accommodation because more stringent membership criteria are applied to a single component of the organization, its adult members. Such a result is clearly inconsistent with the remedial purposes of the LAD. Acceptance of the argument would mean that the private clubs in *Clover Hill, supra*, 47 *N.J.* at 34, 219 *A.2d* 161 and *Fraser, supra*, 44 *N.J.* at 485, 210 *A.2d* 208, are not places of public accommodation because their member-counsellors or lifeguards are subject to more stringent, enhanced training criteria. An extension of defendants' argument would be that the BSA is not a place of public accommodation because of the demanding standards that must be met to become an Eagle Scout.

In any event, selectivity for membership is not necessarily dispositive. For example, colleges and universities are places of public accommodation, *see N.J.S.A.* 10:5–5(*l* ), despite the rigorous admission requirements imposed by many. Moreover, the majority of New Jersey decisions do not embrace the notion, advanced by *Kiwanis Int'l* and the BSA here, that the litmus test in

determining whether an organization is subject to the LAD is whether it employs selective membership criteria. For example, in *Frank v. Ivy Club*, 120 *N.J.* 73, 576 *A.*2d 241 (1990), *cert. denied*, 498 *U.S.* 1073, 111 *S.Ct.* 799, 112 *L.Ed.*2d 860 (1991), the issue was whether Princeton University's private eating clubs were "distinctly private" and thus exempt from the LAD. *Id.* at 102, 576 *A.*2d 241. Membership in certain eating clubs was by invitation only after the applicant submitted to a "Bicker" process, involving interviews and a demanding selection process. *Id.* at 84–85, 576 *A.*2d 241. The Court concluded that the eating clubs were subject to the LAD notwithstanding these selective membership criteria because of the integral and "symbiotic relationship" between the eating club and the University, a place of public accommodation. *Id.* at 108, 576 *A.*2d 241. *See also Clover Hill, supra*, 47 *N.J.* at 31–32, 219 *A.*2d 161 (despite selectivity criteria employed by privately-owned swim club, the club was a place of public accommodation because it had extended an invitation to the public generally by advertisement or otherwise).

Other factors support the conclusion that the BSA is a place of public accommodation. The BSA offers accommodations which "have many attributes in common with [the places and activities enumerated under *N.J.S.A.* 10:5–5(*l*)] . . . which can be characterized either as educational or recreational in nature." *See Fraser, supra*, 44 *N.J.* at 487, 210 *A.*2d 208. The BSA seeks to establish in its members self-sufficiency, physical strength, cleanliness and healthiness through such outdoor activities as camping, biking and hiking. It also stresses educational topics such as democracy, civics, respect for the family and personal development.

Further, although the BSA may not have the type of integral and "symbiotic relationship" with a place of public accommodation, as existed in *Frank, supra*, 120 *N.J.* at 104, 576 *A.*2d 241, we cannot ignore the BSA's historic partnership with various public entities and public service organizations. Local BSA units are chartered by public schools, parent-teacher associations, firehous-

es, local civic associations, and the United States Army, Navy, Air Force and National Guard. The BSA's "learning for life" program has been installed in many public school classrooms throughout the country. Many troops meet in public facilities. These relationships benefit the BSA. The BSA in turn provides essential services through its scouts to the public and quasi-public organizations. This close relationship underscores the BSA's fundamental public character.

For the foregoing reasons, we conclude that the BSA is a place of public accommodation under the LAD.

## II

For the reasons above-expressed, we reject summarily the trial judge's conclusion that defendants qualified for the LAD exclusion in *N.J.S.A.* 10:5–5(*l*) for any "institution . . . which is in its nature distinctly private[.]" The characterization of "distinctly private" has been interpreted to represent merely "the other side of the 'public accommodation' coin." *Kiwanis Int'l, supra,* 806 F.2d at 476. *Accord Brounstein v. American Cat Fanciers Ass'n,* 839 *F.Supp.* 1100, 1107 (D.N.J.1993). Because we conclude that the BSA is a place of public accommodation, it cannot be characterized as "distinctly private."

We also find unpersuasive defendants' alternative argument that they are exempt from the LAD because they qualify as an "educational facility operated or maintained by a bona fide religious or sectarian institution." *N.J.S.A.* 10:5–5(*l*). The BSA is expressly nonsectarian. Even if its requirement that members profess a belief in God were sufficient to render it a bona fide religious or sectarian institution, it does not qualify as an "educational facility." It also does not fall within the exception in the LAD respecting "the right of a natural parent or one *in loco parentis* to direct the education and upbringing of a child under his control." *Ibid.* The BSA's temporary charge of young members does not place it in loco parentis. The status in loco parentis derives from the intent to assume the parental relationship. *A.S.*

*v. B.S.*, 139 *N.J.Super.* 366, 369, 354 *A*.2d 100 (Ch.Div.1976), *aff'd*, 150 *N.J.Super.* 122, 374 *A*.2d 1259 (App.Div.1977). Scouting, no matter how significant a role it may play in a boy's development, does not purport to take the place of parents.

### III

The trial judge also found that plaintiff was not denied accommodations, advantages, facilities or privileges under *N.J.S.A.* 10:5–12f. He reasoned that plaintiff suffered "no legally remedial adverse consequences ... from his termination" and "lost nothing of compensable value," since he was merely a volunteer assistant scoutmaster. We disagree. Clearly, the opportunity to serve as a volunteer must be construed as a privilege within the meaning of the LAD, whether despite, or because of, the duties attached. *See Brounstein, supra,* 839 *F.Supp.* at 1108 (designation of cat show judge was privilege or advantage offered by association to certain of its members, and therefore a privilege under the LAD).

*Quinnipiac Council, BSA, supra,* 528 *A*.2d at 360, relied on by defendants, is distinguishable. There, the Connecticut Supreme Court held that a local boy scout council did not violate the state public accommodation statute by refusing to permit a woman to serve as a scoutmaster. This was so, the Court held, because Connecticut's public accommodation statute guarantees "access to its goods and services," but not the opportunity to offer services. *Id.* at 358. In contrast, the LAD prohibits denial of "accommodations, advantages, facilities or privileges." *N.J.S.A.* 10:5–12f(1). Defendants do not argue persuasively that serving as an assistant scoutmaster does not constitute an advantage or privilege.

### IV

Plaintiff's count in his complaint that he is protected by the common law right not to be expelled from membership on grounds contrary to public policy is duplicative of the LAD claim, and consequently must be dismissed.

■ "It is well-settled that courts will invalidate an expulsion from a private organization when the expulsion is based on reasons that violate public policy." *Rutledge v. Gulian*, 93 *N.J.* 113, 119, 459 *A.*2d 680 (1983). The basis for relief from wrongful expulsion is the member's valuable personal relationship to the organization. *Id.* at 118, 459 *A.*2d 680. However, where the plaintiff was entitled to bring a similar claim under the LAD, it is unnecessary to consider whether a common law action would have been possible. *Catalane v. Gilian Instrument Corp.*, 271 *N.J.Super.* 476, 491, 638 *A.*2d 1341 (App.Div.), *certif. denied*, 136 *N.J.* 298, 642 *A.*2d 1006 (1994).

Plaintiff is correct that his BSA membership conferred the kind of status that merits judicial protection. However, he nevertheless fails to establish that, either at the time of his expulsion or at present, the public policy of New Jersey required greater regulation of discrimination within membership organizations than that required by the LAD. New Jersey's public policy against discrimination based on affectional or sexual orientation is now codified in the LAD. *See Brounstein, supra*, 839 *F.Supp.* at 1111 (public policy against discrimination based on religion made explicit in LAD). We have held that "supplementary common law causes of action may not go to the jury when a statutory remedy under the LAD exists." *Catalane, supra*, 271 *N.J.Super.* at 492, 638 *A.*2d 1341.

■ The LAD does not "bar, exclude or otherwise affect any right or action, civil or criminal, which may exist independently of any right to redress against or specific relief from any unlawful employment practice or unlawful discrimination." *N.J.S.A.* 10:5–27. Nor does the LAD preclude other remedies. "All remedies available in common law tort actions shall be available to prevailing plaintiffs. These remedies are in addition to any provided by this act or any other statute." *N.J.S.A.* 10:5–13. The Legislature declared:

Such harms [those suffered because of discrimination] have, under the common law, given rise to legal remedies, including compensatory and punitive damages.

> The Legislature intends that such damages be available to all persons protected by this act and that this act shall be liberally construed in combination with other protections available under the laws of this State.
>
> [*N.J.S.A.* 10:5–3.]

This passage has been interpreted to express a legislative intent to read the LAD to encompass all those claims and damages previously available at common law, rendering unnecessary a separate common law claim for discrimination in employment. *Catalane, supra,* 271 *N.J.Super.* at 492, 638 *A.2d* 1341. *Accord DeJoy v. Comcast Cable Communications, Inc.,* 941 *F.Supp.* 468, 475–76 (D.N.J.1996). There is no reason not to apply the same rule to claims for discrimination by places of public accommodation.

Prior cases support the principle that where a separate claim for relief is based on the same discrimination allegations underlying the LAD claim, and the court determines that the LAD was not violated, no additional consideration is needed. *Erickson v. Marsh & McLennan Co., Inc.,* 117 *N.J.* 539, 561, 569 *A.2d* 793 (1990). Also, if the LAD creates a remedy, it may be unnecessary to recognize or create a common law action to vindicate substantially the same rights and provide similar relief. *Shaner v. Horizon Bancorp,* 116 *N.J.* 433, 454, 561 *A.2d* 1130 (1989).

In contrast, in some circumstances a plaintiff could pursue an independent action "to vindicate particular interests in addition to or aside from those sought to be protected by a LAD action." *Ibid.* Plaintiff does not demonstrate that a common law cause of action would vindicate any additional interests. He provides no support for a theory that the common law would go farther than the LAD in forbidding discrimination based on affectional or sexual orientation within private organizations as well as places of public accommodation. He argues instead merely that a parallel common law claim should have been permitted. We disagree.

## V

The trial judge, as an alternative basis for dismissing plaintiff's complaint, held that the First Amendment freedom of association

sheltered defendants from the LAD's reach. The judge accepted defendants' assertion that the BSA's fundamental right of freedom of expression permits it to exclude avowed homosexuals who represent and espouse values that are antithetical to boy scout teachings and activities. Defendants' argument, accepted by the trial judge, is that its mission to instill the values of the Scout Oath and Scout Law in boys who join the boy scout troops would be undermined if the state intrudes into its internal affairs by forcing it to accept homosexual members. This contention is predicated on the BSA's policy of excluding avowed homosexuals because homosexuality conflicts with the Scout Oath, demanding that the scout be "morally straight," and the Scout Law, requiring scouts to be "clean."

The trial judge endorsed this view. He stated:

> It is abundantly clear from the proofs presented by BSA that from its inception Scouting has excluded from membership and adult leadership any person who openly declares himself a homosexual and that such policy has continued unchanged, to the present. Such policy applies, a fortiori, to one who engages in homosexual conduct. It is the firm position of BSA that such conduct is not "morally straight" under the Scout Oath nor is it "clean" under the Scout Law.

The judge thereupon gave the generally-recognized definitions of "sodomy" and "buggery," and cited the Judeo–Christian tradition condemning sodomy as a "gravely serious moral wrong." The judge also noted that sodomy in New Jersey was a crime until 1979. He concluded:

> To suggest that the BSA had no policy against active homosexuality is nonsense. It was an organization which from its inception had a God-acknowledged, moral foundation. It required its members, youth and adult, to take the Scout Oath that they would be "morally straight." It is unthinkable that in a society where there was universal governmental condemnation of the act of sodomy as a crime, that the BSA could or would tolerate active homosexuality if discovered in any of its members. . . .
>
> . . . .
>
> According to its mission and purpose, BSA has determined that an assistant scoutmaster who is an active sodomist is simply incompatible with scouting and is not "morally straight." Does the NJLAD require a fundamental, court-imposed, change in its policies? The short answer is No.

The federal constitution does not expressly recognize the right to freedom of association. However, the right may be inferred

from other rights and protections guaranteed by the constitution. Freedom of association was first recognized in 1958 in *NAACP v. Alabama,* 357 *U.S.* 449, 460, 78 *S.Ct.* 1163, 1171, 2 *L.Ed.*2d 1488, 1498 (1958), where the Supreme Court observed that "[e]ffective advocacy of both public and private points of view ... is undeniably enhanced by group association, as this Court has more than once recognized by remarking upon the close nexus between freedoms of speech and assembly." *Ibid.* It is therefore "beyond debate that freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the 'liberty' assured by the Due Process Clause of the Fourteenth Amendment, which embraces freedom of speech." *Ibid.*

Early freedom of association cases involved civil rights groups. *See ibid;* and *see* Sally Frank, *The Key to Unlocking the Clubhouse Door: The Application of Anti–Discrimination Laws to Quasi–Public Clubs,* 2 *Mich. J. Gender & Law,* 27, 57 (1994). Later, unpopular political groups asserted the protection to shield themselves from election laws regulating financial disclosure. *Ibid; see also Brown v. Socialist Workers '74 Campaign Comm.,* 459 *U.S.* 87, 89, 103 *S.Ct.* 416, 418, 74 *L.Ed.*2d 250, 254 (1982); *Buckley v. Valeo,* 424 *U.S.* 1, 74, 96 *S.Ct.* 612, 661, 46 *L.Ed.*2d 659, 719 (1976). The early cases did not involve state attempts to bar discrimination under public accommodation laws.

In *Roberts v. United States Jaycees,* 468 *U.S.* 609, 104 *S.Ct.* 3244, 82 *L.Ed.*2d 462 (1984), the United States Supreme Court provided a framework for analyzing constitutional claims of freedom of association in the context of protection against application of a state's public accommodation law. The Court cited cases affording constitutional protection to freedom of association in two distinct senses: freedom of intimate association, and freedom of expressive association. *Id.* at 617–18, 104 *S.Ct.* at 3249–50, 82 *L.Ed.*2d at 471.

▉▉▉▉ Freedom of intimate association shields against unjust government intrusion into individual's choice to maintain intimate or private associations with others. *Id.* at 618–19, 104 *S.Ct.* at

3249–50, 82 *L.Ed.*2d at 471–72. The intimate relationship accorded this constitutional protection includes such relationships as marriage, child bearing, education and cohabitation with relatives. *Id.* at 619–20, 104 *S.Ct.* at 3250–51, 82 *L.Ed.*2d at 472. The protection applies only to those groups having such attributes as "relative smallness," a high degree of selectivity in decision making, and seclusion from others. *Id.* at 620, 104 *S.Ct.* at 3250, 82 *L.Ed.*2d at 472.

Freedom of intimate association is not implicated here. The BSA consists of nearly 5,000,000 members. It is open to all boys. The BSA engages in aggressive advertising and undertakes a variety of special interest activities in schools and other public forums. Thus, the BSA lacks the distinctive qualities that might afford constitutional protections under this component of the First Amendment.

Freedom of expressive association is a correlative right to an individual's freedom to speak. *Id.* at 622, 104 *S.Ct.* at 3251, 82 *L.Ed.*2d at 474. Implicit in the "right to engage in activities protected by the First Amendment" is "a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious and cultural ends." *Ibid.* Generally speaking, "[o]vertly political organizations [or organizations formed to advance gender or race based interests] are the ones most likely to demonstrate successfully a genuine relationship between their discriminatory practices and their objectives." Frank, *supra*, at 59–60. Justice Brennan, for the *Roberts* Court, observed:

> There can be no clearer example of an intrusion into the internal structure or affairs of an association than a regulation that forces the group to accept members it does not desire. Such a regulation may impair the ability of the original members to express only those views that brought them together. Freedom of association therefore plainly presupposes a freedom not to associate.
>
> [*Roberts, supra*, 468 *U.S.* at 623, 104 *S.Ct.* at 3252, 82 *L.Ed.*2d at 474–75.]

The Court cautioned, however, that:

> The right to associate for expressive purposes is not, however, absolute. Infringements on that right may be justified by regulations adopted to serve

compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms.

[*Id.* at 623, 104 *S.Ct.* at 3252, 82 *L.Ed.*2d at 475.]

Applying this framework, the Supreme Court in *Roberts* held that Minnesota's public accommodations law, by requiring the admission of women to the Jaycees, did not unconstitutionally infringe upon the male members' freedom of expressive association. *Id.* at 628–29, 104 *S.Ct.* at 3255–56, 82 *L.Ed.*2d at 478. The Court found no basis for concluding that the law would require any change in the organization's creed, or impose any restrictions on its "ability to exclude individuals with ideologies or philosophies different from those of its existing members." *Id.* at 627, 104 *S.Ct.* at 3254, 82 *L.Ed.*2d at 477. *See generally* Eunice A. Eichelburger, Annotation *Civil Rights Laws Prohibiting Organization's Membership Restrictions as Violating Organization's or its Members' Rights of Association Under Federal Constitution's First Amendment,* 82 *L.Ed.*2d 1040 (1986) (collecting cases).

Three years later, the United States Supreme Court applied the *Roberts* analytical framework in holding that California's Unruh Act did not violate the First Amendment right of expressive association by requiring a Rotary Club to admit women, where the members' ability to carry out their purposes would not be affected "in any significant way." *Board of Dirs. of Rotary Int'l v. Rotary Club of Duarte,* 481 *U.S.* 537, 548, 107 *S.Ct.* 1940, 1947, 95 *L.Ed.*2d 474, 486–87 (1987). The Court observed that Rotary Clubs do not take positions on political issues and, although they "engage in a variety of commendable service activities that are protected by the First Amendment," the Unruh Act "does not require the clubs to abandon or alter any of these activities." *Id.* at 548, 107 *S.Ct.* at 1947, 95 *L.Ed.*2d at 486. The Court added:

Even if the Unruh Act does work some slight infringement on Rotary members' right of expressive association, that infringement is justified because it serves the State's compelling interest in eliminating discrimination against women.

[*Id.* at 549, 107 *S.Ct.* at 1948, 95 *L.Ed.*2d at 486.]

One year later, the Court rejected a challenge to the facial validity of a New York City law forbidding discrimination by

certain clubs with more than 400 members, finding that it did not infringe on the members' private associational rights in any significant way. *New York State Club Ass'n, Inc. v. City of New York,* 487 *U.S.* 1, 13, 108 *S.Ct.* 2225, 2234, 101 *L.Ed.*2d 1, 16 (1988). The law did not require the clubs "to abandon or alter" any activities protected by the First Amendment, because, as long as prohibited categories were not used as shorthand identification of rejected individuals, the law did not prevent exclusion of individuals who did not share the views the members wished to promote. *Ibid.* The Court added a caveat, however:

> It is conceivable, of course, that an association might be able to show that *it is organized for specific expressive purposes and that it will not be able to advocate its desired viewpoints nearly as effectively if it cannot confine its membership to those who share the same sex, for example, or the same religion.*
>
> [*Ibid,* (emphasis added).]

What emerges from this trilogy of cases is a recognition of the tension between the freedom to associate for the purpose of expressing fundamental views and the compelling state interest in eradicating discrimination. *Roberts, supra,* 468 *U.S.* at 623, 104 *S.Ct.* at 3252, 82 *L.Ed.*2d at 475. Conciliation of these competing forces is achieved if the state's enforcement of its anti-discrimination law is unrelated to the suppression of ideas and will not "affect in any significant way the existing members' ability to carry out their various purposes." *Board of Dir. of Rotary Int'l, supra,* 481 *U.S.* at 548, 107 *S.Ct.* at 1947, 95 *L.Ed.*2d at 486. Thus, the organization or club asserting the freedom has a substantial burden of demonstrating a strong relationship between its expressive activities and its discriminatory practice. Any lesser showing invites scuttling of the state's anti-discrimination laws based on pretextual expressive claims. *See* Frank, *supra,* at 63.

By enacting the LAD, the Legislature declared that the practices of discrimination are a matter of concern to the government and that "such discrimination threatens not only the rights and proper privileges of the inhabitants of the State but menaces the institutions and foundation of a free democratic State." *N.J.S.A.* 10:5-3. The Legislature recognized that because of discrimina-

tion, "people suffer personal hardships, and the State suffers a grievous harm." *Ibid.* New Jersey prides itself on being in "the vanguard in the fight to eradicate . . . unlawful discrimination of all types . . ." *Peper v. Princeton Univ. Board of Trustees,* 77 *N.J.* 55, 80, 389 *A.*2d 465 (1978). Thus, the "overarching goal of the [LAD] is nothing less than the eradication" of discrimination. *Fuchilla, supra,* 109 *N.J.* at 334, 537 *A.*2d 652.

By amendment to *N.J.S.A.* 10:5–4 in 1991 (*L.*1991, c. 519, § 2), the Legislature expanded the categories of persons protected to include discrimination based on "affectional or sexual orientation." This was an implicit recognition that discrimination based on "archaic" and "stereotypical notions" about homosexuals that bears no relationship to reality cannot be countenanced. *Roberts, supra,* 468 *U.S.* at 625, 104 *S.Ct.* at 3253, 82 *L.Ed.*2d at 476. It is also a recognition that the "stigmatizing injury" and denial of equal opportunities that accompanies it is felt no less strongly by this protected group than others who suffer personal hardship because of discriminatory practice. *Ibid.*

### VI

Will New Jersey's compelling interest in eradicating discrimination by enforcement of the LAD significantly impair the BSA's ability to express its fundamental tenets and to carry out its social, educational and civic activities? For purposes of discussion, we accept the proposition that such goals and activities are protected by the First Amendment freedom of expressive association. *See id.* at 622, 104 *S.Ct.* at 3251, 82 *L.Ed.*2d at 474.

We start with the undisputed fact that the BSA's collective "expressive purpose" is not to condemn homosexuality. Its reason to be is not to provide a public forum for its members to espouse the benefits of heterosexuality and the "evils" of the homosexual lifestyle. As plaintiff convincingly observes, "[b]oys are not urged to join Scouting to learn the 'evils' of being gay, nor are adult leaders recruited to advance some anti-gay agenda." Motivation to advance such anti-gay views was not what "brought [the

original members] together." *Id.* at 623, 104 *S.Ct.* at 3252, 82 *L.Ed.*2d at 475.

Rather, a definition of the BSA's mission, purposes and fundamental beliefs is found in its Congressional Charter, bylaws, rules and regulations, and handbooks. The BSA was chartered by Congress with a stated purpose "to promote ... the ability of boys to do things for themselves and others, to train them in Scoutcraft, and to teach them patriotism, courage, self-reliance, and kindred virtues...." To achieve these goals, the BSA's bylaws provide that emphasis shall be placed upon its "educational program and the oaths, promises and codes of the Scouting program for character development, citizenship training, mental and physical fitness." The BSA's mission is to "serve others by helping to instill values in young people and, in other ways, to prepare them to make ethical choices over their lifetime in achieving their full potential." To that end, the BSA trains and educates boys in camping and other outdoor activities, democracy, civics, respect for the family, personal strength and development, self-sufficiency and sexual responsibility. True to the Scout Oath and Scout Law, adult scout leaders endeavor to impart in the scouts the traditional values of trustworthiness, honesty, independence, physical and moral courage, commitment, cleanliness and fidelity.

We conclude that enforcement of the LAD by granting plaintiff access to the accommodations afforded by scouting will not affect in "any significant way" BSA's ability to express these views and to carry out these activities. On its face, the LAD "does not aim at the suppression of speech nor does it distinguish between prohibited and permitted activity on the basis of viewpoint...." *Id.* at 623, 104 *S.Ct.* at 3253, 82 *L.Ed.*2d at 475. As applied to the facts before us, it cannot convincingly be argued that the LAD's proscription against discrimination based on "affectional or sexual orientation" impedes the BSA's ability to express its collective views on scouting, or to instill in the scouts those qualities of leadership, courage and integrity to which the BSA has traditionally adhered. The LAD does not in any manner require the BSA

to abandon or alter any of its laudable activities and programs. The focal point of its prohibition is the act of discrimination against individuals respecting access to public accommodations. Its application here leaves in place the integral workings of the BSA and its constitutional right to carry out its mission.

Indeed, the goals of the BSA are in many respects compatible with the purposes sought to be achieved by the LAD. Its Congressional Charter states that the BSA's bylaws and rules shall not be "inconsistent with the law of the United States of America, or any State thereof...." 36 *U.S.C.A.* § 22. Such "laws," of course, include anti-discrimination laws. The BSA's publications stress that neither its federal charter nor its bylaws "permits the exclusion of any boy." Consequently, the BSA has a long-term commitment "to a membership that is representative of all economic and racial groups," and encourages its local councils to establish membership that is "representative of *the total population* of the council or district." (Emphasis added). This commendable quality of inclusion is not at all inconsistent with the purposes of New Jersey's anti-discrimination law.

We reject as irrelevant the trial judge's conclusion that "[a]ccording to its mission and purpose, BSA has determined that an assistant scoutmaster who is an active sodomist is simply incompatible with scouting and is not morally straight." The question here is whether the BSA discriminated against plaintiff because of his "affectional or sexual orientation." The BSA excluded plaintiff because he was an avowed homosexual, not because he was an "active sodomist." The observation also raises, no doubt inadvertently, the sinister and unspoken fear that gay scout leaders will somehow cause physical or emotional injury to scouts, or will instill in them ideas about the homosexual lifestyle. "The prevalence of homophobia and stereotypical conceptions of homosexuality within society as a whole, and within the legal system in particular, have been well documented." Patricia J. Falk, *The Prevalence of Social Science in Gay Rights Cases: The Synergistic Influences of Historical Context, Justificatory Cita-*

*tion & Dissemination Efforts,* 41 *Wayne L.Rev.* 1, 37 (1994). *Accord* Frank, *supra,* at 27 n. 60; David P. Russman, *Alternative Families: In Whose Best Interests?,* 27 *Suffolk U.L.Rev.* 31, 58–59 (1993); Darryl Robin Wishard, *Out of the Closet & Into the Courts: Homosexual Fathers & Child Custody,* 93 *Dick. L.Rev.* 401, 406 (1989). *Roberts* cautions that, in examining an association's freedom of expressive association claim, "legal decision making that relies uncritically on such [unproven] assumptions" must be condemned. 468 *U.S.* at 628, 104 *S.Ct.* at 3255, 82 *L.Ed.*2d at 478. Such assumptions, predicated on stereotypical generalizations, rather than fact, cannot be employed as "shorthand measures" in place of legitimate factors justifying First Amendment protection. *New York State Club Ass'n, Inc., supra,* 487 *U.S.* at 13, 108 *S.Ct.* at 2234, 101 *L.Ed.*2d at 16.

There is absolutely no evidence before us, empirical or otherwise, supporting a conclusion that a gay scoutmaster, solely because he is a homosexual, does not possess the strength of character necessary to properly care for, or to impart BSA humanitarian ideals to the young boys in his charge. Nothing before us even suggests that a male, simply because he is gay, will somehow undermine BSA's fundamental beliefs and teachings. Plaintiff's exemplary journey through the BSA ranks is testament enough that these stereotypical notions about homosexuals must be rejected.

Nevertheless, defendants appear to focus on plaintiff's statements as a "gay activist." They claim that his "message," his avowed homosexuality, is "at odds" with scouting's expressive purposes set forth in the Scout Oath and Scout Law. Defendants reason that plaintiff "could hardly be an effective role model for Scouting's morally straight value when he 'stands up' for a view of morality which is inconsistent with that value."

The Boy Scout Oath requires a boy scout to be "morally straight." To be morally straight, one must be:

of strong character, guide your life with honesty, purity, and justice. Respect and defend the rights of all people. Your relationships with others should be honest

and open. Be clean in your speech and actions, and faithful in your religious beliefs. The values you follow as a Scout will help you become virtuous and self-reliant.

The Scout Law requires a scout to be "clean," that is, a scout "keeps his body and mind fit and clean. He chooses the company of those who live by the same ideals. He helps keep his home and community clean." Defendants argue that "morally straight" and "clean" are collective "expressive" ideals of the BSA which will be compromised if avowed homosexuals are admitted as scout leaders.[3]

This focus on "morally straight" and "clean" as a basis for excluding avowed homosexual scoutmasters is only of recent vintage. The first reference to homosexuals is found in a March 17, 1978 "memorandum" to the BSA's exclusive executive council from its Chief Scout Executive. It states that a "declare[d]" homosexual may not be a volunteer scoutmaster because "the [BSA] is a private, membership organization and [participation in the program] is a privilege and not a right." Significantly, the reason cited for the exclusion is the BSA's view that it is a "private" organization, not because homosexuals cannot be "morally straight" or "clean."

Plaintiff was expelled from the BSA on July 19, 1990. In the BSA's expulsion letter, the BSA explains that plaintiff "should understand that BSA membership registration is a privilege" and "is not automatically granted to everyone who applies." No

---

[3] The only reference to homosexuality we could find in the voluminous record is in the Scoutmaster's Handbook. The scoutmaster is directed that he should not instruct scouts in the subjects of sex and family life because such subjects are not within "Scouting's proper area" and that scoutmasters are not qualified to address the subjects. The handbook directs that if a scoutmaster is confronted with homosexual activity between two boy scouts, the scoutmaster must distinguish between "youthful acts of innocence, and the practices of a confirmed homosexual who may be using his Scouting association to make contacts." The scoutmaster is instructed to "keep quiet" about these instances and to refer the offending boy scout to appropriate counselling programs. Notably, this directive refers to homosexual boy scouts, not scout leaders.

reference is made to the "morally straight" or "clean" criteria under the Scout Oath or Scout Law.

On June 6, 1991, eleven months after plaintiff's expulsion, the BSA issued a "Position Statement" which, for the first time declares:

> We believe that homosexual conduct is inconsistent with the requirement in the Scout Oath that a Scout be morally straight and in the Scout Law that a Scout be clean in word and deed, and that homosexuals do not provide a desirable role model for Scouts.

> Because of these beliefs, the Boy Scouts of America does not accept homosexuals as members or as leaders, whether in volunteer or professional capacities.

> Our position on this issue is based solely upon our desire to provide the appropriate environment and role models which reflect Scouting's values and beliefs.

That "Position Statement" was repeated from time to time until January 1993, when the BSA refined it, stating:

> The Boy Scouts of America has always reflected the expectations that Scouting families have had for the organization.

> We do not believe that homosexuals provide a role model consistent with these expectations.

> Accordingly, we do not allow for the registration of avowed homosexuals as members or as leaders of the BSA.

We cannot accept the proposition that this "Position Statement," issued for the first time seventy-six years after Congress granted the BSA its Charter, represents a collective "expression" of ideals and beliefs that brought the boy scouts together. Coincidentally, these 1991 and 1993 "Position Statements" were expressed by the BSA during a time when their anti-gay policy was subject to judicial challenge in California. *See Curran, supra,* 29 *Cal. Rptr.*2d at 583–85. The First Amendment freedom of expressive association issue was squarely before the *Curran* Court. *Ibid.* It is therefore not unrealistic to view these "Position Statements" as a litigation stance taken by the BSA rather than an expression of a fundamental belief concerning its purposes.

In any event, aside from the undebatable fact that this so-called "position" was not even set forth in a written document when plaintiff was expelled, it is undisputed that such policy has not been incorporated into the BSA's bylaws, rules, regulations and

handbooks. It was not contained in plaintiff's application for the adult scoutmaster position. As far as we can determine from the record, the "Position Statement" has not been disseminated throughout the BSA hierarchy and, except during litigation, has not been presented to the public as representative of BSA's official position. Indeed, the appendix is rife with affidavits from past and present boy scouts and adult leaders stating that during their tenure they had no knowledge that such a policy even existed.

Moreover, this "Position Statement" hardly squares with the view shared by a substantial percentage of church groups who sponsor local boy scout troops. For example, retired Bishop Melvin Wheatly, Jr., of the United Methodist Church, states in his certification:

> The United Methodist Church has a particularly strong relationship with and commitment to Boy Scouts of America ("BSA") and the values represented by BSA. BSA is an organization which fosters values such as honesty, loyalty, reverence, integrity and commitment in boys and young men. It is because of these values that The United Methodist Church has been the largest single supporter of BSA nationally, sponsoring more than 200 BSA troops in New Jersey alone. BSA's discrimination against homosexuals, however, is inconsistent with the clearly expressed condemnation by The United Methodist Church of discrimination on the basis of sexual orientation and has no apparent relation to the values that form the basis of The United Methodist Church's commitment to BSA.

> BSA's discrimination against homosexuals offends the human dignity of such persons. The United Methodist Church has been very clear in condemning discrimination on the basis of sexual orientation.

Further, the Union of American Hebrew Congregations, representing 900 congregations and over 1,500,000 reformed Jews, has called upon the BSA to "open its membership and leadership to all ... men and boys without regard to the sexual orientation." Other religious groups, including the organizations joined as *amici*, many of whom sponsor boy scout troops, have publicly declared their opposition to the BSA's anti-gay position. Some of the groups in fact petitioned the New Jersey Legislature to amend the LAD to prohibit discrimination based on "affectional or sexual orientation." Finally, the record contains certifications from many boy scout leaders recording their efforts to change the Executive Board's policy on gays.

What is clear is that the BSA's preemptive exclusion of avowed homosexuals is employed without regard for the diverse ideological differences among the religious institutions and other groups who support the BSA's ideals and activities. As plaintiff and *amici* persuasively argue, the BSA has not attempted to exclude these religious institutions on the basis that the institutions have condemned the anti-gay policy. Nor has it moved in a wholesale manner to expel heterosexual scouts who have condemned the practice. In contrast, a gay scout leader who says absolutely nothing about the morality or lifestyle of homosexuals is subject to expulsion if he discloses his sexual orientation. These facts belie the BSA's argument that its collective purpose is to "exclude individuals who do not share the views that the club's members wished to promote." *New York State Club Ass'n, Inc., supra,* 487 *U.S.* at 13, 108 *S.Ct.* at 2234, 101 *L.Ed.*2d at 16. The facts diminish the BSA's assertion that its policy excluding avowed gays was a collective view that "brought [its members] together." *Roberts, supra,* 468 *U.S.* at 623, 104 *S.Ct.* at 3252, 82 *L.Ed.*2d at 475.

Defendants argue that because plaintiff's "manifest" views as an avowed homosexual are "at odds" with positions taken by the BSA, plaintiff may be excluded from membership under the United States Supreme Court's holding in *Hurley v. Irish–American Gay, Lesbian and Bisexual Group of Boston,* 515 *U.S.* 557, 115 *S.Ct.* 2338, 132 *L.Ed.*2d 487 (1995).

In *Hurley,* the South Boston Allied War Veterans Council (Council) was authorized by the City of Boston to organize and conduct the St. Patrick's Day—Evacuation Day parade. *Id.* at 560, 115 *S.Ct.* at 2341, 132 *L.Ed.*2d at 495. The Council refused a place in the 1993 parade to GLIB, an Irish–American gay group joined together for the sole purpose of marching in the parade as a way to express its members' pride in their Irish heritage as openly gay, lesbian and bisexual individuals. *Id.* at 561, 115 *S.Ct.* at 2341, 132 *L.Ed.*2d at 496. The state court admitted GLIB into the parade, holding that a parade was a public accommodation

under Massachusetts law, and that mandating inclusion of GLIB did not infringe upon the Council's right of expressive association. *Id.* at 562–63, 115 *S.Ct.* at 2341–42, 132 *L.Ed.*2d at 496–97.

In reversing, the United States Supreme Court focused on the Council's First Amendment freedom of speech, not its freedom of expressive association. Defining parades as "public dramas of social relations," *id.* at 568, 115 *S.Ct.* at 2345, 132 *L.Ed.*2d at 500, the Court determined that "[t]he protected expression that inheres in a parade is not limited to its banners and songs," but extends to its communicated symbolism as well. *Id.* at 569, 115 *S.Ct.* at 2345, 132 *L.Ed.*2d at 500–01.

The South Boston parade involved people marching in costumes and uniforms, carrying flags and banners with all sorts of messages (*e.g.,* "England get out of Ireland," "Say no to drugs"), with marching bands, pipers and floats. *Id.* at 569, 115 *S.Ct.* at 2345, 132 *L.Ed.*2d at 501. The Court rejected the notion that a private speaker forfeits his constitutional freedom of expression protection "simply by combining multifarious voices, or by failing to edit their themes to isolate an exact message as the exclusive subject matter of the speech." *Id.* at 569–70, 115 *S.Ct.* at 2345, 132 *L.Ed.*2d at 501. The Court compared the Council's role in assembling and administrating the parade with a newspaper's edited compilation of other people's speech on its editorial page, a constitutionally protected activity. *Id.* at 570, 115 *S.Ct.* at 2346, 132 *L.Ed.*2d at 501.

The Court found that the Massachusetts public accommodations law had been "applied in a peculiar way" in that its enforcement did not address the fact that the Council had not excluded homosexuals as such; they could participate in the parade as a member of any group that the Council had approved to march. *Id.* at 572, 115 *S.Ct.* at 2347, 132 *L.Ed.*2d at 503. Despite this fact, GLIB demanded that it march in the parade as a single unit "carrying its own banner." *Ibid.*

The Court held that the Massachusetts courts' application of the public accommodation law "produced an order essentially requir-

ing [the Council] to alter the expressive content of [its] parade." *Id.* at 572–73, 115 *S.Ct.* at 2347, 132 *L.Ed.*2d at 503. By making the Council's "speech" itself to be the public accommodation, "any contingent of protected individuals with a message would have the right to participate in [the Council's] speech, so that the communication produced by the private organizers would be shaped by all those protected by the law who wished to join in with some expressive demonstration of their own." *Id.* at 573, 115 *S.Ct.* at 2347, 132 *L.Ed.*2d at 503. This use of the state's power "violates the fundamental rule of protection under the First Amendment, that a speaker has the autonomy to choose the content of his own message." *Ibid.* This freedom involves not only the choice of what is to be said, but what is to be left unsaid. *Ibid.* Thus, whatever the reason the Council had in excluding GLIB, "it boils down to the choice of a speaker not to propound a particular point of view, and that choice is presumed to lie beyond the government's power to control." *Id.* at 575, 115 *S.Ct.* at 2348, 132 *L.Ed.*2d at 504.

The Court concluded:

> When the law is applied to expressive activity in the way it was done here, its apparent object is simply to require speakers to modify the content of their expression to whatever extent beneficiaries of the law choose to alter it with messages of their own. But in the absence of some further, legitimate end, this object is merely to allow exactly what the general rule of speaker's autonomy forbids.
>
> [*Id.* at 578, 115 *S.Ct.* at 2350, 132 *L.Ed.*2d at 507.]

Applying *Hurley,* defendants argue that plaintiff's affirmation of his homosexuality is "expressive activity" which presents the same "potential for a clash of views as the gay, lesbian and bisexual contingent which sought to march in Boston's St. Patrick's Day—Evacuation Day Parade."

As noted, *Hurley* is a First Amendment speech case. It involves "the choice of a speaker [the Council] not to propound a particular point of view" in its South Boston parade which communicated diverse and ethnic social messages. *Id.* at 574–75, 115 *S.Ct.* at 2348, 132 *L.Ed.*2d at 504. In other words, the Court was protecting a form of pure speech, the collective expressive views of

the parade itself. Significantly, the Court did not undertake a freedom of expressive association analysis under the *Roberts* trilogy of cases. This was so no doubt because of the Court's "initial recognition in its analysis that the Parade itself constituted expression." Kristine M. Zaleskas, *Pride, Prejudice or Political Correctness? An Analysis of Hurley v. Irish–American Gay, Lesbian & Bisexual Group of Boston,* 29 *Colum. J.L. & Soc. Probs.* 507, 547 (1996).

In *Roberts,* and the other freedom of expressive association cases, the Court was called upon to decide whether or not the public accommodations statutes would require the organization to "alter substantially its activities." *Zaleskas, supra,* at 547. Consequently, the Court's focus was on those activities, not the content of any speech associated with those activities. *Id.* at 548. Indeed, *Hurley* appears to preserve the holding and analysis of the *Roberts* trilogy of cases, noting that in those cases, by compelling access to the benefits afforded by the activity of the organizations, the state had not trespassed on the organizations' message itself. *Hurley, supra,* 515 *U.S.* at 580, 115 *S.Ct.* at 2351, 132 *L.Ed.*2d at 508. In *dictum,* the *Hurley* Court observed parenthetically that GLIB would still lose, applying the *Roberts* analysis, because it could be "refused admission as an expressive contingent with its own message just as readily as a private club could exclude an applicant whose manifest views were at odds with a position taken by the club's existing members." *Id.* at 580–81, 115 *S.Ct.* at 2351, 132 *L.Ed.*2d at 508.

In our view, *Hurley* is not dispositive here. In *Hurley,* both the Council's parade (reflecting diverse ethnic and social values) and GLIB's desire to participate (to express as a unit its pride in its members' Irish heritage and homosexuality) were expressive activities. As plaintiff observes, both the parade and GLIB's participation were pure forms of speech. To enforce inclusion of GLIB's message in the parade had the effect of altering the expressive context of the speaker's (the Council's) purpose in conducting the parade. Unlike a parade, where the "marchers

... are making some sort of collective point," *id.* at 568, 115 *S.Ct.* at 2345, 132 *L.Ed.*2d at 500, the BSA is a national organization focusing its energy and resources on activities aimed at the physical, moral and spiritual development of boys and young men. The public accommodation law implicated here simply demands access to those activities; it does not attempt, directly or indirectly, to hamper the BSA's ability to carry out these activities or express its views respecting their benefits.

Also, plaintiff is not asserting a right under the LAD to alter the content of the BSA's viewpoint. He merely seeks access to a public accommodation, participation in boy scout activities. His public acknowledgment that he is a homosexual is hardly comparable to a banner in a parade declaring his pride in his homosexuality.

■ Finally, we cannot accept the proposition that plaintiff's public declaration that he is gay in and of itself constitutes "expressive activity" sufficient to forfeit his entitlement to membership in the BSA. The BSA's argument that this "message" given by plaintiff's declaration conflicts with the BSA "morally straight" and "clean" policies falters, when one considers other scout laws to which scouts promise to subscribe. The scout promises to be "trustworthy," that is, to tell the truth. "Honesty is part of his code of conduct. People can depend always on him." A scout also promises to be "brave," that is, to have the courage "to stand for what he thinks is right even if others laugh at him or threaten him." In our view, there is a patent inconsistency in the notion that a gay scout leader who keeps his "secret" hidden may remain in scouting and the one who adheres to the scout laws by being honest and courageous enough to declare his homosexuality publicly must be expelled. We also cannot accept the proposition that the BSA has a constitutional privilege of excluding a gay person when the sole basis for the exclusion is the gay's exercise of his own First Amendment right to speak honestly about himself.

The dismissal of plaintiff's common law claims is affirmed. Otherwise, the summary judgment order is reversed, and the matter is remanded for further proceedings.

LANDAU, J.A.D., (concurring and dissenting).

It is unlikely, in my view, that the New Jersey Legislature originally intended that private groups, large or small, would be deemed to be "places" of public accommodation, akin to hotels, stores, restaurants, theaters and the like, whose discriminatory conduct troubled our collective conscience when the LAD was enacted in 1945. Use of the words "other real property" in *N.J.S.A.* 10:5–4 in the phrase "place of public accommodation, publicly assisted housing accommodation, and other real property" would incline me to a property-based interpretation, were this truly a matter of first impression. *See also N.J.S.A.* 10:1–5; 10:5–5(*l* ).

I am persuaded, nonetheless, partly by the enduring, legislatively undiluted, vitality of the *Little League* [1] opinion in this State, and partly by the authorities cited in the majority's carefully crafted opinion, that notwithstanding authority to the contrary, *see, e.g., Welsh v. Boy Scouts of Am.,* 993 *F.*2d 1267 (7th Cir.), *cert. denied,* 510 *U.S.* 1012, 114 *S.Ct.* 602, 126 *L.Ed.*2d 567 (1993), judicial interpretation has generally transformed organizations which extend an open invitation to public membership as broad as that of the Boy Scouts into places of public accommodation for purposes of statutes such as the LAD.

What has been lost in the majority's opinion is our traditional focus upon the special facts of the case on appeal. James Dale, who excelled as a Boy Scout, has been prominently publicized as an avowed, practicing homosexual and also as a leader in organizational activities given to the promotion of the interests of gay and

---

[1] *National Org. for Women, Essex County Chapter v. Little League Baseball, Inc.,* 127 *N.J.Super.* 522, 318 *A.*2d 33 (App.Div.), *aff'd,* 67 *N.J.* 320, 338 *A.*2d 198 (1974).

lesbian students. He wants to continue his scouting career in a leadership capacity as a volunteer scoutmaster or assistant scoutmaster.

Concerned that accepting an avowed homosexual as a scoutmaster would signify endorsement of such a lifestyle in contradiction to their declared policies against extramarital sex and homosexual activity, the Boy Scouts went beyond refusing Dale a volunteer leadership post. They also revoked his Boy Scout membership.

These facts require us to address two separate issues, restriction of membership and restriction of leadership. As a "place" of public accommodation, the Boy Scouts should not have revoked Dale's membership. I must concur with the majority in that regard.

What of the second issue?

In January 1993, several years after revocation of Dale's membership, the Boy Scouts promulgated a Position Statement providing, in pertinent part:

> The Boy Scouts of America does not ask prospective members about their sexual preference, nor do we check on the sexual orientation of boys who are already Scouts. The reality is that Scouting serves children who have no knowledge of, or interest in, sexual preference. We allow youth to live as children and enjoy Scouting and its diversity without immersing them in the politics of the day.
>
> Membership in Scouting is open to all youth who meet basic requirements for membership and who agree to live by the applicable oath and law.

> \*       \*       \*

> The Boy Scouts of America has always reflected the expectations that Scouting families have had for the organization.
>
> We do not believe that homosexuals provide a role model consistent with these expectations.
>
> Accordingly, we do not allow for the registration of avowed homosexuals as members or as leaders of the BSA.

The present members of the Boy Scouts number approximately five million. We are told that as many as ninety million boys and men have enjoyed membership in the Boy Scouts since 1910. Surely the Boy Scouts are aware that, statistically, a number of

these must have been gay. There obviously has been no anti-gay witch hunt in the Boy Scout movement.

The defendants' consistent theme is evident; scouting condemns homosexual practice as morally unacceptable, and so acts negatively with respect to its open avowal because it is inconsistent with one of the expressed moral policies of the organization.

The 1972 Scoutmaster's Handbook emphasized a scout leader's duty as a role model, and advised:

> You are providing a good example of what a man should be like. What you do and what you are may be worth a thousand lectures and sermons.... What you are speaks louder than what you say. This ranges from simple things like wearing the uniform to the matter of your behavior as an individual. Boys need a model to copy and you might be the only good example they know.

If their perception of the immorality of homosexuality is in fact an important part of the Boy Scouts' institutional message to young Scouts, what Jim Dale openly professes and exemplifies clearly flies in the face of that view. When we force the Boy Scouts to permit him to serve as a volunteer leader, we force them equally to endorse his symbolic, if not openly articulated, message. I believe that this violates the right of expressive association guaranteed by the First Amendment of the United States Constitution. Even when a membership association provides public benefits to which this State may insure equal access under the LAD, such compelled access to membership does not carry with it a right to "trespass on the organization's message itself." *Hurley v. Irish–American Gay, Lesbian and Bisexual Group of Boston,* 515 *U.S.* 557, 580, 115 *S.Ct.* 2338, 2351, 132 *L.Ed.*2d 487, 508 (1995); *New York State Club Ass'n, Inc. v. City of New York,* 487 *U.S.* 1, 108 *S.Ct.* 2225, 101 *L.Ed.*2d 1 (1988). We may not compel the Boy Scouts to alter a message which they wish to convey by including messages more acceptable to others. *Hurley, supra,* 515 *U.S.* at 581, 115 *S.Ct.* at 2351, 132 *L.Ed.*2d at 508. This principle is not changed merely because the altered message is implicitly, but no less strongly, conveyed by example rather than by verbal articulation or by signs.

As applied to Dale's status as scoutmaster, I differ with the majority's reliance upon *Roberts v. United States Jaycees*, 468 *U.S.* 609, 104 *S.Ct.* 3244, 82 *L.Ed.*2d 462 (1984). There, only admission to Jaycee membership was the issue. Of course, the Boy Scouts were not organized for the primary purpose of advancing an anti-gay agenda. However, nothing in *Roberts* prevents an organization from advocating its view that a gay lifestyle is immoral and undesirable without requiring it to provide a platform for competing advocacy, express or implicit. Indeed, as *Hurley* demonstrates, the First Amendment guarantees the Boy Scouts that right of unfettered advocacy.

To the extent the majority opinion questions the fundamental nature of the Boy Scouts' profession of an organizational view on homosexuality, there are two equally dispositive responses. First, it is not for this court to tell the Boy Scouts what to believe or what to profess. That is an internal matter. Their consistent litigation stand in cases like this, and the representations of their governing officials are enough for me. There has been no contravening intervention by opposing Boy Scout groups, although other, non-affiliated, *amici curiae* are abundantly represented in this appeal.

Secondly, when limited to the First Amendment issue of the expressive effect of elevating Dale to an adult leadership role (as distinct from his admission to or retention of Boy Scout membership), whether or not the Boy Scouts' stand on homosexuality is fundamental to that organization's creation is entirely irrelevant.

Based upon the above views, I respectfully dissent from the majority opinion to the extent it would compel the Boy Scouts to accept plaintiff James Dale as assistant scoutmaster or to any Scout leadership position. I concur with the majority result, to the extent that it would require plaintiff be restored to membership.