Jeffrey FOWLER, Vincent Salceto, George Miller, Martin Moran, David Harris, and Sherman Tillman, Plaintiffs,

v.

BOROUGH OF WESTVILLE and, Westville Police Department, Defendants.

Civil Action No. 99–2929 (JEI).

United States District Court, D. New Jersey.

May 16, 2000.

Matthew S. Wolf, Haddonfield, NJ, for Plaintiffs.

Aaron Michael Barker, Linwood, NJ, for Defendants.

## OPINION

IRENAS, District Judge.

Presently before the Court is the summary judgment motion of defendants Borough of Westville and Westville Police Department. For the reasons set forth below, this motion is denied.

### I.

Plaintiffs, Jeffrey Fowler, Vincent Salceto, David Harris, and Sherman Tillman ("plaintiffs"), are recovering alcoholics or drug users and residents of one of two group homes located in Westville, New Jersey.[1] The group homes, located at 118 Broadway, Westville, New Jersey ("Broadway") and 14 Pine Street, Westville, New Jersey ("Pine Street"), are owned by Steven Savoca and John Raggio, respectively. In or around 1996, Savoca and Raggio, themselves recovering substance abusers, dedicated these properties for use as group homes for recovering alcoholics and drug addicts. The homes were run on the "Oxford House" model; the residents were self-sufficient, house conflicts were resolved democratically, and any resident who relapsed was ejected from the house by the other residents.

On June 22, 1999, plaintiffs filed the Complaint in this matter alleging that defendants sought to drive them out of Westville "by excessive police activity directed at the residents of the houses ... and excessive regulatory actions by the Borough against the landlords of the properties." (Pls.' opp., 4). They assert claims under the Fair Housing Act, 42 U.S.C. § 3601, et seq. ("FHA"), the New Jersey Law Against Discrimination ("NJLAD"), N.J.S.A. 10:5-1, et seq., and 42 U.S.C. §§ 1981 and 1982.[2] On April 14, 2000, defendants filed the instant motion for summary judgment pursuant to Fed. R.Civ.P. 56(c). Defendants move for sum-

---

1. By Order of the Court dated April 13, 2000, plaintiffs George Miller and Martin Moran were dismissed from this case for failure to comply with their discovery obligations.

2. Plaintiffs have consented to dismissal of their claims under §§ 1981 and 1982.

mary judgment as to all claims and argue, *inter alia*, that plaintiffs are not "handicapped" as that term is defined under the FHA and the NJLAD, and that the police and regulatory activity directed at plaintiffs was lawful and justified.

In support of their Complaint and in opposition to defendants' motion, plaintiffs primarily rely on two affidavits, one from John Raggio and one from Steven Savoca. In his affidavit, Savoca alleges that the Borough Administrator for Westville, William Bittner, Jr., had several conversations with him regarding the residents of the Broadway and Pine Street properties and that Bittner "conveyed to [him] that he was against having people in recovery reside in the houses." (Aff. of S. Savoca, ¶ 10). Plaintiffs allege that Bittner either directed or prompted much of the regulatory and police activity aimed at forcing plaintiffs out of Westville.

On July 29, 1996, the Borough of Westville charged Savoca with a violation of Westville Ordinance § 89–3, alleging that he failed to obtain a Certificate of Occupancy ("C.O.") for the Broadway property. (*Id.* at ¶ 11). This matter was resolved on November 20, 1996, through a plea agreement. (*Id.* at ¶ 12). In the plea agreement, Savoca agreed to apply for a C.O. and to allow the Borough to conduct annual inspections of the Broadway property as if it were registered as a boarding house. (Pls.' Ex. B, attached to aff. of S. Savoca). In exchange, the Borough agreed that the property would be registered as a single family rental unit. (*Id.*) In addition, Savoca paid a fine and costs. (Aff. of S. Savoca, ¶ 13).

On November 21, 1996, in accordance with the plea agreement, Savoca applied for a C.O. (*Id.* at ¶ 14). Shortly thereafter, a building inspector employed by the Borough of Westville inspected the premises. (*Id.*) According to Savoca, the building inspector never issued him a notice of noncompliance. (*Id.*) However, on April 15, 1998, Savoca was again cited for not having a C.O. for the Broadway property. (Defs.' Ex. D).

In September of 1996, the New Jersey Department of Community of Affairs ("DCA") began investigating the Broadway property for purposes of determining whether it qualified as a boarding house under the Rooming and Boarding House Act of 1979, N.J.S.A. 55:13B–1, *et seq.*[3] According to plaintiffs, William Bittner took an active role in attempting to classify the Broadway property as a boarding house. (Pls.'s opp. 11–12, ¶ 35). On May 20, 1997, the DCA served an "Order to Pay Penalty, Notice of Violation and Order of the Commissioner" on Savoca. (Pls.' Ex. I). This Order stated that the Broadway property was in violation of the Rooming and Boarding House Act and ordered Savoca to pay a fine and to apply for a license to operate this property as a boarding house. (*Id.*)

On January 23, 1998, the Borough of Westville served Savoca with a Notice of Violation stating that a $500 a week fine was going to be assessed against Savoca until the property complied with fire safety requirements. (Defs.' Ex. D). The violation was based on a change in the property's status from "Use Group" R–3 to "Use Group" R–2. (*Id.*) According to plaintiffs, the Westville Building Inspector changed the property's classification in order to subject it to increased fire code compliance expenses. (Pls.' opp. 29). Pursuant to the 1990 BOCA code, category R–2 structures include:

> [A]ll multiple-family dwellings having more than two dwelling units, except as

---

**3.** Section 7(a) of the Act provides that:

No person shall own or operate a rooming or boarding house, hold out a building as unavailable for rooming or boarding house occupancy, or apply for any necessary construction or planning approvals related to the establishment of a rooming or boarding house without valid license to own or operate such a facility, issued by the Commissioner.

N.J.S.A. 55:13B–7.

provided for in Section 309.4 for multiple single-family dwelling units, and shall also include all boarding houses and similar buildings arranged for shelter and sleeping accommodations in which the occupants are primarily transient in nature.

In contrast, the code defines R–3 structures to include, "[A]ll buildings arranged for the use of one- or two-family dwelling units, including not more than five lodgers or boarders per family and multiple single-family dwellings where each unit has an independent means of egress and is separated by a 2–hour fire separation assembly. . . ." Plaintiffs contend that the Broadway property is an R–2 structure because it constitutes a single family dwelling unit. Plaintiffs point out that none of the individual rooms had locks on the doors and each of the tenants had an undivided right to occupy the entire unit. (Pls.' opp. 30).

The Pine Street property is a three unit building. According to John Raggio, the property passed inspection by the DCA and received a Certificate of Registration as a multiple dwelling. (Aff. of J. Raggio, ¶ 5). However, Raggio asserts that within ten days of the inspection an inspector from the DCA came to the property and sought to conduct a second inspection. (*Id.* at ¶ 6).

Aside from the above-mentioned regulatory activity, plaintiffs claim that the Westville Police Department engaged in a pattern of conduct intended to harass the residents of the Broadway and Pine Street properties. In his affidavit, Steven Savoca states that several of the residents of the properties complained to him of police harassment. (Aff. of S. Savoca, ¶ 17). Savoca alleges that he called the Westville Police Department in response to these complaints and was told that "William Bittner had been directing them." (*Id.*) Savoca claims that he relayed this allegation to Bittner and Bittner responded, "If you think we are going to let those people stay in this town, you have got another thing coming." (*Id.*)

## II.

"[S]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' " *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(c)).

In deciding a motion for summary judgment, the Court must construe the facts and inferences in a light most favorable to the non-moving party. *Pollock v. American Tel. & Tel. Long Lines,* 794 F.2d 860, 864 (3d Cir.1986). The role of the court is not "to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## III.

Before reaching the merits of defendants' motion and plaintiffs' opposition thereto, the Court must consider several procedural issues raised by the parties. Plaintiffs ask the Court to dismiss defendants' motion because defendants have failed to comply with the requirements of Local Rule 56.1. Rule 56.1 provides that "[o]n a motion for summary judgment, each side shall furnish a statement which sets forth material facts as to which there exists or does not exist a genuine issue." Defendants have not complied with this Rule. Although their initial brief does contain a statement of facts, defendants have not submitted a separate statement specifically identifying the disputed and the undisputed material facts. While defendants failure to comply with the Rule is itself sufficient to deny their motion, the Court declines to do so in this case. *See Bowers v. NCAA,* 9 F.Supp.2d 460, 476 (D.N.J.

1998)("This failure to comply with the Local Civil Rule would by itself suffice to deny [defendant's] motion for summary judgment."). Because there is no evidence of bad faith on the part of the defendants, the Court will deny defendants' motion on the merits, rather than on this procedural ground.

In their reply brief, defendants ask this Court to strike the affidavits of Steven Savoca and John Raggio.[4] Defendants claim that these affidavits should be stricken because "both contain either information not relevant to the case before this Court or not within the personal knowledge of the affiants." (Defs.' reply, 4). Fed.R.Civ.P. 56(e) provides that affidavits "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify as to the matters stated therein." Similarly, Local Rule 7.2 states that "[a]ffidavits shall be restricted to statements of fact within the personal knowledge of the affiant. Argument of the facts and the law shall not be contained in affidavits."

The actions of defendants testified to by Savoca and Raggio in these affidavits are clearly relevant to plaintiffs' allegations. However, several statements contained within these affidavits run afoul of Rule 56(e)'s proscriptions. First, both Savoca and Raggio make statements which are based on mere belief, rather than personal knowledge. "Affidavits speculating as to motivations but containing no factual support do not conform to the rule and statements prefaced by the phrases, 'I believe' or 'upon information and belief'... are properly subject to a motion to strike." *Carey v. Beans*, 500 F.Supp. 580, 583 (E.D.Pa.1980)(internal citations omitted). In paragraph 16 of his affidavit, Savoca states "I believe that Westville did not want to give me a C.O. because they wanted to run my tenants out of town." In paragraph 18, he states, "Westville be-

lieved that it did not have to follow its own ordinances." Similarly, in paragraph 22 Savoca states "I felt this alleged violation was just another attempt to drive the tenants out of town."

The affidavit of John Raggio also violates Rule 56(e). In paragraph 9(b), Raggio states, "I believe the DCA did this at the behest of Westville but this is based only on the circumstances that I believe this." Also, in paragraph 9(d), he states, "I believe that the reason proceedings were brought against us was because our tenants were in recovery." Because these statements and the above-mentioned statements by Savoca are not founded upon personal knowledge, the Court will not consider these statements in deciding the present motion for summary judgment. *See Bowdoin v. Oriel*, No. Civ. A. 98–5539, 2000 WL 134800, at *3 (E.D.Pa. Jan. 28, 2000)(holding that courts should disregard statements in affidavits which are not based on personal knowledge or those portions that contain inadmissible hearsay); *see also Christiana Marine Service Corp. v. Seaboard Shipping Corp.*, No. Civ.A. 96–8705, 1997 WL 587292, at *3 n. 2 (E.D.Pa. Sept. 10, 1997) (denying motion to strike affidavit in its entirety, instead disregarding those statements not based on affiant's personal knowledge).

Second, in paragraph 6 of Raggio's affidavit, Raggio states that an inspector from the Department of Community Affairs "told one of the residents that the Department of Community Affairs was going to 'shut this place down.'" This statement is hearsay and would be inadmissible at trial. Therefore, this paragraph will be disregarded by the Court. *See Philbin v. Trans Union Corp.*, 101 F.3d 957, 961 n. 1 (3d Cir.1996)(holding that hearsay statements that are not "capable of being admissible at trial" may not be considered on a motion for summary judgment).

---

4. Defendants do not object to specific portions of the Savoca and Raggio affidavits, but instead seek to have the Court strike both affidavits in their entirety.

Finally, attached to Savoca's affidavit is a collection of "witness statements". (Aff. of S. Savoca, Ex. K). In these statements, current and former residents of the Broadway and Pine Street properties allege that the Westville Police Department conducted various activities at these properties. However, several of these "statements" are unsigned and all are unsworn and unnotarized. *See Small v. Lehman*, 98 F.3d 762, 765 n. 5 (3d Cir.1996) (holding that unsworn statements fail to meet requirement of rule allowing parties to support their opposition to summary judgment by affidavits), *overruled on other grounds by Boerne v. Flores*, 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997). The Court will not consider these statements in its resolution of the present motion.

### IV.

■ The Fair Housing Act, 42 U.S.C. § 3604(f)(2) provides, in pertinent part:

> [It shall be unlawful] [t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling because of a handicap of—
>
> (A) that person; or
>
> (B) a person residing in or intending to reside in that dwelling after it is so sold, rented or made available; or
>
> (C) any person associated with that person.

The Act defines "handicap" as:

> (1) a physical or mental impairment which substantially limits one or more of such person's major life activities;
>
> (2) a record of having such an impairment;
>
> (3) being regarded as having such an impairment,
>
> but such term does not include current, illegal use of or addiction to a controlled substance.

42 U.S.C. § 3602(h).

Defendants concede that drug and alcohol dependency may qualify as a "handi-cap" under the Act. However, they argue that Jeffrey Fowler does not meet the definition of a handicapped person because he is a current drug user. In a deposition taken on February 21, 2000, Fowler stated that "four months ago," while he was residing at the Pine Street home, he used cocaine. (Defs.' Ex. E, dep. of J. Fowler, 12:23–25, 13:1–11). He further stated that his use of cocaine at this time continued for "[m]aybe a month." (*Id.* at 14:1).

The term "current drug use" is not defined in the Fair Housing Act. However, several courts have interpreted the meaning of current drug use under the Americans with Disabilities Act ("ADA") and the Rehabilitation Act. For example, in *Shafer v. Preston Memorial Hospital Corp.*, 107 F.3d 274 (4th Cir.1997), the Fourth Circuit rejected plaintiff's argument that "current" drug use, under the ADA and the Rehabilitation Act, means drug use at the exact moment that an adverse employment action was taken. In *Shafer*, plaintiff admitted that she illegally used drugs during the weeks and months prior to her discharge and that she stole narcotics from the Hospital to support her addiction less than a month before she was fired. *Id.* at 278. The Hospital placed her on a medical leave of absence, and ultimately discharged her. *Id.* She then sued, alleging that she was terminated unlawfully because of her addiction to, rather than use of, drugs. *Id.* She claimed that the Hospital was prohibited from firing her because she entered drug rehabilitation after being caught and because she was not using drugs on the day she was fired. *Id.* Relying on the legislative history of the ADA and the Rehabilitation Act and the EEOC's interpretative guidelines, the Fourth Circuit concluded that, "an employee illegally using drugs in the weeks and months prior to discharge is a 'current' illegal user of drugs for purposes of the ADA and Rehabilitation Act." *Id.* at 280.

The Court's opinion in *Shafer* has been followed by the majority of courts to con-

sider the issue. *See, e.g., McDaniel v. Miss. Baptist Med. Ctr.,* 877 F.Supp. 321, 327–28 (S.D.Miss.1994) (holding that a person who was drug-free for six weeks before being terminated was "engaging in illegal drug use"; legislative history of the ADA indicates that long-term abstinence is required); *Baustian v. Louisiana,* 910 F.Supp. 274, 276–77 (E.D.La.1996) (holding that seven weeks' abstinence does not satisfy ADA requirement that person be in recovery long enough to have become stable); *Wormley v. Arkla, Inc.,* 871 F.Supp. 1079, 1084 (E.D.Ark.1994) (holding that a person's drug use in month before discharge was "sufficiently recent to justify an employer's reasonable belief that it was an ongoing problem rather than a problem that was in the past," and was "current" use under the ADA). The Court agrees with the holdings of these courts and finds their reasoning applicable under the Fair Housing Act. *See Oxford House, Inc. v. Township of Cherry Hill,* 799 F.Supp. 450, 459 (D.N.J.1992)(noting that definition of "handicap" in the Fair Housing Act was taken directly from § 504 of the Rehabilitation Act, 29 U.S.C. § 794). However, based on the record currently before the Court, the Court does not find that Fowler falls within the definition of a "current" drug user under the FHA, § 3602(h).

In this case, the only evidence of "current" drug use proffered by defendants is Fowler's deposition testimony that he used illegal drugs in approximately October of 1999. However, the Complaint in this case was filed approximately four months earlier, in June of 1999. In denying the protections of the ADA and the Rehabilitation Act to persons "currently" using drugs, the above-cited cases suggest that the benchmark date is the date of the alleged discrimination or harassment which underlies the lawsuit, not the date on which a dispositive motion is filed. In this case, there is no evidence which links Fowler to illegal drug use reasonably contemporaneous with the alleged incidents of discrimination. Accordingly, Fowler's claims under the FHA will not be dismissed on this basis.

■ Defendants further argue that even if plaintiffs qualify as "handicapped" under the FHA, they are not entitled to the protections of that Act because they cannot prove that their respective handicaps substantially limit a major life activity. Assuming, arguendo, that plaintiffs do not suffer a substantial limitation of a major life activity, plaintiffs argue that they still meet the definition of "handicap" set forth at § 3602(h)(2) and (3) because they have a "record of" or are "regarded as" being handicapped. The Court agrees, a plain reading of the statute indicates that the "substantial limitation" requirement contained in subsection (1) of § 3602(h) does not apply to subsections (2) and (3). There is, at the least, a triable issue of material fact as to whether plaintiffs had "a record of" or were "regarded as" handicapped for purposes of the FHA. Thus, the Court will deny defendants' motion for summary judgment on this issue.

■ Defendants also argue that plaintiffs do not meet the definition of "handicap" under the NJLAD. Pursuant to the NJLAD, N.J.S.A. 10:5–5(q), "handicapped" is defined as:

[S]uffering from a physical disability, infirmity, malformation or disfigurement which is caused by bodily injury, birth defect or illness ... or from any mental, psychological or developmental disability resulting from anatomical, psychological, physiological or neurological conditions which prevents the normal exercise of any bodily or mental functions or is demonstrable, medically or psychologically, by accepted clinical or laboratory diagnostic techniques.

New Jersey Courts have recognized that drug addicts and alcoholics meet this statutory definition. *See Matter of Cahill,* 245 N.J.Super. 397, 585 A.2d 977 (App.Div. 1991) (defining a drug addict as a handicapped person); *Clowes v. Terminix Int'l.,* 109 N.J. 575, 538 A.2d 794 (1988)(holding

that alcoholism is a protected handicap under the NJLAD).

Defendants do not offer a separate argument with respect to the NJLAD, but merely restate their argument with respect to the FHA and assert that the analysis is "identical" under the NJLAD. (Defs.' brief, 24). Because this Court has already rejected defendants' argument that·plaintiffs are not "handicapped" under the FHA, it also rejects defendants' identical arguments with respect to the NJLAD.

## V.

■ In Count I of the Complaint, plaintiffs assert claims under the FHA, 42 U.S.C. §§ 3604(f)(1) and (f)(2).[5] 42 U.S.C. § 3604(f)(1) provides that:

> [It shall be unlawful to] discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap of—(A) that buyer or renter, (B) a person residing in or intending to reside in that dwelling after it is sold, rented, or made available; or (C) any person associated with that buyer or renter.

In the instant motion for summary judgment, defendants argue that plaintiffs cannot maintain a claim under subsection (f)(1) because they have not shown that they were actually denied housing. Defendants argue, "[w]ithout showing they were denied housing, Plaintiffs cannot prevail on Count I of their Complaint, and any claim by Plaintiffs of disparate treatment, without denial of housing, is not actionable under the FHA." (Defs.' reply, 7). Defendants note that, at their deposition, each plaintiff testified that at no point was either the Broadway or Pine Street property closed, boarded up, or shut down and at no time was any plaintiff told by a defendant,

or a representative of a defendant, that he could not reside in either of the two properties.

Defendants' argument raises a novel issue under the FHA. Can a plaintiff assert a claim under § 3604(f)(1) which makes it unlawful to "make unavailable or deny" a person housing on the basis of his or her handicap, where there was no actual denial of housing? The few cases to have considered the issue suggest that such a claim is cognizable under § 3604(f)(1). In *Growth Horizons, Inc. v. Delaware County, Pennsylvania*, 983 F.2d 1277, 1283 (3d Cir. 1993), the Third Circuit rejected defendant's argument that in order to assert a claim under § 3604(f)(1) plaintiffs must prove that defendant's actions made it "impossible" for them to obtain housing. The Court held that "conduct short of foreclosing a housing opportunity altogether may violate the statute." *Id.* Similarly, in *McDonald v. Verble*, 622 F.2d 1227, 1232 (6th Cir.1980), the Sixth Circuit held that the fact that black plaintiffs were ultimately able to purchase a home at a price comparable to that at which it had been offered to a prospective white buyer did not cure prior discriminatory conduct (racial steering) on the part of vendors and a real estate agent. *See also Trice v. Lake & Country Real Estate*, 831 F.2d 1064, 1987 WL 38852 (6th Cir.1987)(unpublished disposition)(holding that plaintiffs were entitled to damages under § 3604 even though defendant did not actually prevent them from negotiating or purchasing the property); *Heights Community Congress v. Hilltop Realty, Inc.*, 629 F.Supp. 1232, 1249 (N.D.Ohio 1983)("It is not necessary for racial steering to be successful in order for the act to violate section 3604(a), for attempts to steer are also proscribed."), *aff'd*

---

**5.** Although plaintiffs assert claims under both 42 U.S.C. § 3604(f)(1) and § 3604(f)(2), the Court finds that the facts as alleged by plaintiffs do not support a claim under subsection (f)(2). The acts complained of by plaintiffs, increased police activity and regulatory harassment, do not constitute discrimination in the "terms, conditions, or privileges of sale or rental of a dwelling," nor do they involve "the provision of services or facilities in connection with … a dwelling." Accordingly, the Court will dismiss plaintiffs' claims under § 3604(f)(2) and will analyze plaintiffs' claims in this section only with respect to § 3604(f)(1).

*in part and rev'd in part on other grounds,* 774 F.2d 135 (6th Cir.1985); *Zuch v. Hussey,* 394 F.Supp. 1028, 1048 (E.D.Mich.1975)("The fact that the defendants did not succeed in steering the plaintiffs away from the transitional neighborhoods of Detroit is not relevant; the law makes it unlawful even to attempt.").[6]

The Court agrees with the holdings of these courts. The Supreme Court has stated that courts should give an expansive interpretation to the provisions of the FHA in order to effectuate its purposes. *Trafficante v. Metropolitan Life Ins. Co.,* 409 U.S. 205, 211–12, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972). It would run contrary to the remedial purposes of the statute to hold that a defendant, acting with the intent of denying a handicapped person housing, could avoid liability merely because his efforts were unsuccessful. The Court concludes that the FHA is directed at the elimination of discriminatory conduct, not merely discriminatory results,

and that plaintiffs may assert a claim under § 3604(f)(1).

Even if plaintiffs may assert a claim under § 3604(f)(1), defendants argue that they did not discriminate against plaintiffs in violation of the statute. Defendants concede that several summons were issued to Steven Savoca and John Raggio, the landlords of the Broadway and Pine Street properties. However, defendants argue that these summons were issued in order to induce compliance with Westville rental ordinances, not for any improper purpose. The record indicates that the following summons were issued to Savoca with respect to the Broadway property:

(1) April 15, 1998. Violation of Ordinance 84–4–C; failure to amend registration form to note the change of tenants at 118 Broadway. (Defs.' Ex. D).

(2) April 15, 1998: Violation of Ordinance 89–3; failure to obtain a certificate of occupancy for the rooming house at 118 Broadway, second floor. *(Id.)*

---

**6.** These holdings are supported by the Third Circuit's recent decision in *Alexander v. Riga,* 208 F.3d 419 (3d Cir.2000). In that case, plaintiffs, an African–American couple, filed suit in the district court claiming that defendants, Mr. And Mrs. Riga, refused to rent them an apartment on the basis of their race. After a trial, the jury found that Mrs. Riga had violated the Fair Housing Act when she denied rental housing to the plaintiffs based upon race. However, the jury found Mrs. Riga's conduct was not "a legal cause of harm" to the plaintiffs and did not award damages. Thus, the District Court entered judgment in favor of Mrs. Riga and against the plaintiffs. Finding that in a case alleging discrimination under the Fair Housing Act "discrimination itself is the harm," the Third Circuit reversed. *Id.* at 423. The Third Circuit explained:

> The plain language of the Fair Housing Act thus permits an individual to obtain relief for the discriminatory housing practice or breach. A prospective tenant must prove only that a landlord did one of the unlawful acts listed in section 3604 with respect to the prospective tenant's attempt to obtain housing. If an individual proves discrimination, he or she need not prove anything else. The District Court imposed upon the statute another requirement, "le-

gal causation." The Rigas argue that the discrimination is the "legal cause" for the "harm," which itself must be proved. To the contrary, the "harm" is the discrimination.

> The Alexanders felt themselves to be the victims of housing discrimination and sued the Rigas under the Fair Housing Act, both to vindicate their unlawful treatment and the public interest in fair housing. One "unlawful act" of several which falls under the ambit of section 3604 is that the Alexanders were told that the apartment was not available, when it was. The statute directly focuses on that situation, seeks to deter it, and seeks to remedy it. At trial, the Alexanders related what transpired during their housing search and also described additional adverse consequences, such as emotional distress, for which they sought compensatory damages. Although the jury declined to award compensatory damages for any adverse consequences flowing from the discrimination, the jury believed that the Alexanders were indeed victims of illegal discrimination. We conclude that the District Court misstated the proper legal standard in this Fair Housing Act case by requiring "legal causation" beyond a showing of illegal discrimination.
> *Id.* at 427.

(3) April 20, 1998: Violation of Ordinance 65–55 A & C; failure to obtain a certificate of occupancy for a change of use of the first floor of 118 Broadway, "formally a tailor shop, now a counciling [sic]/meeting area." (*Id.*)

(4) January 23, 1998. Violation of State Uniform Construction Code Act and Regulations. Ordered to (a) provide automatic fire sprinkler system throughout entire building, (b) provide an automatic fire alarm system, and (c) enclose the interior stairway from the first floor to the second floor with a one hour fire-rated assembly. (*Id.*)

(5) May 14, 1998. Violation of State Uniform Construction Code Act and Regulations; failure to obtain a certificate of occupancy prior to changing the Use Group of the second floor from R–3 to R–2. (*Id.*)

In addition, the following summons were issued to John Raggio with regard to the Pine Street property:

(1) April 18, 1997. Violation of Ordinance 89–2; failure to have a registered agent within a fifteen mile radius of the Borough of Westville. (*Id.*)

(2) April 18, 1997. Violation of Ordinance 89–2; failure to submit a change of registration as the new owner of 14 Pine Street. (*Id.*)

(3) January 27, 1998. Violation of Ordinance 89–4.C; failure to provide an amended registration for the first floor front apartment, first floor rear apartment, and second floor apartment. (*Id.*)

Defendants argue that these summons were issued solely because the properties failed to comply with Westville rental ordinances, and that they were not influenced by any discriminatory animus. In support of this argument, defendants rely upon the supplemental affidavit of William Bittner. Mr. Bittner states, in pertinent part:

It was the Department of Community Affairs that determined Pine Street and Broadway were rooming houses, thus subject to inspections and regulations appropriate for rooming houses, including the requirement for a license. Westville simply took the same position, i.e., that Broadway and Pine Street were required to meet the specifications of Westville's rental dwelling ordinances.

■ (Supp. Aff. of W. Bittner, ¶ 5). To prove a violation of § 3604(f)(1), a plaintiff must show either intentional discrimination or a discriminatory impact. *Oxford House*, 799 F.Supp. at 460. In order to prove intentional discrimination, plaintiffs must show that the decision to deny them housing opportunities was motivated, at least in part, by their disabilities. However, they need not show that the actions of the defendants themselves were illegal. If defendants' actions were undertaken with a discriminatory intent, the FHA is violated even if those action were otherwise justified under state law. *U.S. v. Borough of Audubon*, 797 F.Supp. 353, 360 (D.N.J. 1991).

■ The determination of whether an action is based on "discriminatory intent" requires a "sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Village of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 255–56, 97 S.Ct. 555, 50 L.Ed.2d 450, (1977) (Arlington Heights I ). "This inquiry is required because it is unusual that a public official will openly reveal that he or she acted on the basis of discriminatory intent." *Horizon House Dev. Serv., Inc. v. Township of Upper Southampton*, 804 F.Supp. 683, 696 (E.D.Pa.1992)(citing *Dailey v. Lawton*, 425 F.2d 1037, 1039 (10th Cir.1970)). As evidence of discriminatory intent, courts may look to the impact of an official decision, the historical background behind a decision, or the specific sequence of events leading up to a decision. *Arlington Heights I*, 429 U.S. at 266–67, 97 S.Ct. 555. For example, in *Arlington Heights I*, 429 U.S. at 267, 97 S.Ct. 555, the Supreme Court stated:

[I]f the property involved here always had been zoned R–5 but suddenly was

changed to R–3 when the town learned of MHDC's plans to erect integrated housing, we would have a far different case. Departures from the normal procedural sequence also might afford evidence that improper purposes are playing a role.

In addition, a defendant will be liable under the FHA, even in the absence of discriminatory intent, for failure to make "reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B).

Plaintiffs have offered sufficient evidence of discriminatory intent to survive defendants' summary judgment motion. In his affidavit, Steven Savoca alleges that William Bittner told him, on more than one occasion, that he was against having people in recovery in the Broadway and Pine Street houses. (Aff. of S. Savoca, ¶ 10). Also, Savoca alleges that Bittner specifically told him that, "If you think we are going to let those people stay in this town, you have got another thing coming." (*Id.* at ¶ 17). Based on these alleged statements, the change of the Broadway property's "Use Group" from R–3 to R–2, and the zealous enforcement of Westville rental ordinances, the Court finds that plaintiffs have created a triable issue of fact as to whether defendants intentionally discriminated against them in violation of § 3604(f)(1) either by their overt acts or by their failure to accommodate plaintiffs' handicaps.

## VI.

■■■■■ In Count II of the Complaint, plaintiffs charge defendants with violating 42 U.S.C. § 3617. That section provides that:

It shall be unlawful to coerce, intimidate, threaten, or interfere with any person in

the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section 3603, 3604, 3605, or 3606 of this title.[7]

Defendants argue that plaintiffs' claim under § 3617 must be dismissed because "no liability can be imposed on a person for violating § 3617 of the FHA unless the threat of force is apparent." (Defs.' reply, 10). Defendants cite several cases in which actual physical violence was used to discourage a plaintiff from moving into a neighborhood or to encourage a plaintiff to move out of a neighborhood. For example, defendants cite *Stackhouse v. DeSitter,* 620 F.Supp. 208 (N.D.Ill.1985), in which a black resident of a neighborhood claimed that a white resident attempted to coerce him into moving by firebombing his car. Defendants cite no case, however, in which violence or physical coercion was held to be a necessary prerequisite to a claim under § 3617. Indeed, several cases have held just the opposite.

In *Michigan Protection and Advocacy Serv., Inc. v. Babin,* 18 F.3d 337, 347 (6th Cir.1994), the Sixth Circuit rejected the district court's holding that to state a claim under § 3617 a plaintiff needed to show that defendants' actions included "potent force or duress." The Circuit Court held that § 3617 "is not limited to those who used some sort of 'potent force or duress,' but extends to other actors who are in a position directly to disrupt the exercise or enjoyment of a protected right and exercise their powers with a discriminatory animus." *Id.* The Court further held that the term "interfere with" in the statute encompassed such "overt acts" as racially-motivated firebombings and sending threatening notes, and also "less obvious, but equally illegal," practices such as exclusionary zoning, deflating appraisals, and

---

**7.** A defendant may be found liable for violating § 3617 without being found liable under any other section of the Act. *Salisbury House,* *Inc. v. McDermott,* No. CIV.A. 96–CV–6486, 1998 WL 195693, at *11 (E.D.Pa. March 24, 1998).

insurance redlining. *Id.* (internal citations omitted).

Similarly, in *People Helpers, Inc. v. City of Richmond*, 789 F.Supp. 725 (E.D.Va.1992), the district court held that conduct which did not include violence or physical coercion could, nonetheless, violate § 3617. In that case, plaintiff, an organization that provided housing to African–Americans and persons with disabilities, alleged that City police officers repeatedly "bullied" their way into and selectively searched the apartments of African–American and handicapped tenants. *Id.* at 731. Plaintiff further alleged that when the police found that no criminal activity was being conducted at the residents' apartments, the City shifted its focus and began, via the city housing inspector, investigating the apartments for zoning problems. *Id.* at 730–31. Plaintiffs argued that all these investigations were conducted in bad faith and were designed to intimidate plaintiff from providing housing to African–Americans or the disabled. In contrast, defendant City of Richmond stated that it conducted only limited inquiries into the activities of the residents and that "no client of People Helpers was ever arrested, prosecuted, beaten up, or forced to suffer any other indignity. . . ." *Id.* at 733.

The Court concluded that plaintiff's allegations, supported by affidavits, had created an issue of material fact for the jury. The Court held that although the alleged acts of defendants did not involve physical violence, "when the full weight of the City is brought to bear on a person and where criminal and other types of investigations are threatened . . . it cannot be said that interference, coercion, or intimidation of the type contemplated by § 3617 did not occur." *Id.* at 733 n. 5. This Court agrees with the holding in *People Helpers* and the holding of the Sixth Circuit in *Babin* and concludes that violence or physical coercion is not a prerequisite to a claim under § 3617.

The facts as alleged in this case are similar to those presented in *People Helpers*. Plaintiff Vincent Salceto testified that the Westville Police pulled him over four or five times between 1996 and June of 1999, but that he was never arrested or issued a citation. (Aff. of V. Salceto, 41:1–25, 42:1–6). Plaintiffs Harris and Tillman testified that Westville police officers would often drive by the group homes and stare at them. (Aff. of S. Tillman 28:5–22; Aff. of D. Harris, 32:16–24). In addition, plaintiff Jeffrey Fowler testified that, while he was manager of the group home at Pine Street, he received numerous complaints from residents that Westville police officers had harassed them. (Aff. of J. Fowler, 45:5–25). Fowler also testified that the Police would often stop by the house "looking for certain people" and that even when he told them that those persons were not in the house, the police would return later with the same questions. (*Id.* 45–48). In light of these allegations and the previously mentioned regulatory activities of the City of Westville and the City of Westville housing inspector, the Court finds that plaintiffs have created a genuine issue of material fact as to their claim under § 3617.

## VII.

Defendants also seek to dismiss plaintiffs' claims under the NJLAD because, they argue, plaintiffs were not actually "denied" housing or any other "inherent right." Essentially this argument tracks plaintiffs' earlier argument, discussed in section IV above, with respect to the FHA, § 3604(f)(1). Defendants do not cite a case which holds that to assert a claim under the NJLAD, a plaintiff must be "denied" an "inherent right." Indeed, the NJLAD itself contains no such restriction. N.J.S.A. 10:5–4 provides that:

> All persons shall have the opportunity to obtain . . . all the accommodations, advantages, facilities, and privileges of any place of public accommodation, publicly assisted housing accommodation, and

other real property without discrimination because of race, creed, color, national origin, ancestry, age, marital status, affectional or sexual orientation or sex....

N.J.S.A. 10:5–4.1 extends the protections of the Act to "presently or previously handicapped person[s]." Section 10:5–4.1 states, "[a]ll of the provisions of the act to which this act is a supplement shall be construed to prohibit any unlawful discrimination against any person because such person is or has been at any time handicapped...."

The Court finds that plaintiffs may a assert a claim under the NJLAD even if plaintiffs were not actually denied housing. The NJLAD is intended to provide handicapped persons "full and equal access to society, limited only by physical limitations they cannot overcome." *D.I.A.L., Inc. v. New Jersey Dep't. Of Community Affairs*, 254 N.J.Super. 426, 603 A.2d 967, 974 (App.Div.1992)(citing *Andersen v. Exxon Co.*, 89 N.J. 483, 446 A.2d 486 (1982)). The Law seeks to eradicate discrimination, not merely the intended consequences of discrimination and should be construed liberally. *See Dale v. Boy Scouts of America*, 308 N.J.Super. 516, 706 A.2d 270, 279 (App.Div.1998)("The overarching goal of the [NJLAD] is nothing less than eradication of discrimination and its provisions must be construed liberally to effectuate that purpose.")(quoting *Fuchilla v. Layman*, 109 N.J. 319, 537 A.2d 652, 660 (1988)); *see also* N.J.S.A. 10:5–3 ("[D]iscrimination threatens not only the rights and proper privileges of the inhabitants of the State but menaces the institutions and functions of a free democratic State.") Thus, if plaintiffs can prove that they were discriminated against on the basis of their actual or perceived handicaps, they may assert a claim under the NJLAD. If defendants can prove that this discrimination was ineffective, in other words, that it did not actually lead to a denial of housing, this fact may alter the amount or nature of damages available at trial, but it will not prevent plaintiffs from asserting their claims under the NJLAD.

## VIII.

For the reasons set forth above, defendants motion for summary judgment is denied. However, the Court will dismiss plaintiffs' claims under 42 U.S.C. §§ 1981, 1982 and plaintiffs' claim under 42 U.S.C. § 3604(f)(2). The Court will issue an appropriate order.